**No. 19-55864**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

LODESTAR ANSTALT,

*Plaintiff-Appellant*,

v.

BACARDI & COMPANY LIMITED,
BACARDI U.S.A., INC.,
AND BACARDI LIMITED,

*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - CASE NO. 2:16-cv-06411-CAS-FFM

---

**OPENING BRIEF OF APPELLANT/PLAINTIFF LODESTAR ANSTALT**

---

Gary J. Nelson, CA Bar No. 184651
G. Warren Bleeker, CA Bar No. 210834
Drew Wilson, CA Bar No. 283616
LEWIS ROCA ROTHGERBER
CHRISTIE LLP
655 N. Central Avenue, Suite 2300
Glendale, CA 91203-1445
Tel. (626) 795-9900
gnelson@lrrc.com
wbleeker@lrrc.com
dwilson@lrrc.com

*Attorneys for Appellant/Plaintiff*
Lodestar Anstalt

109632154.6

## CORPORATE DISCLOSURE STATEMENT

Counsel for the Appellant/Plaintiff certifies the following:

1.    The full name of every party represented by me is: LODESTAR ANSTALT

2.    The names of the real parties in interest (if the parties named in the caption are not the real parties in interest) represented by me are: LODESTAR ANSTALT

3.    The parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are: None.

4.    The names of all law firms and other partners or associates that appeared for the party or amicus now represented by me in the trial court or agency are expected to appear in this court are:

- Gary J. Nelson

- G. Warren Bleeker

- Drew Wilson

- Lewis Roca Rothgerber Christie, LLP


Dated: November 4, 2019            Respectfully submitted,

LEWIS ROCA ROTHGERBER CHRISTIE, LLP

By   s/G. Warren Bleeker        
          G. Warren Bleeker

*Attorneys for Appellant/Plaintiff*
LODESTAR ANSTALT

1

# TABLE OF CONTENTS

**Page**

I. STATEMENT OF JURISDICTION ...................................................... 2

    A. Basis For District Court's Subject Matter Jurisdiction ....................... 2

    B. Basis For the Court of Appeals' Jurisdiction ........................................ 2

    C. Final Judgment Was Entered By The District Court ............................ 2

    D. Timeliness Of Appeal ........................................................................ 2

II. STATEMENT OF ISSUES ................................................................ 2

III. STATEMENT OF THE CASE ........................................................... 4

    A. Nature of the Case ............................................................................ 4

    B. Lodestar And Its Critically Acclaimed Spirits .................................... 5

    C. Lodestar's Business and Licensing Model .......................................... 7

    D. Lodestar's United States Trademark Rights, Trademark Priority, and Trademark Registration ........................................ 9

    E. Lodestar's Use of its UNTAMED Mark in the United States ............ 10

        1. Lodestar's Use of UNTAMED in The U.S. on Whiskey Prior To Bacardi's Infringement ................................. 10

        2. Lodestar's Prominent Use of UNTAMED on Rum in U.S. Prior to Bacardi's Infringement ......................... 10

        3. Bacardi's Confusingly Similar Mark on The Same Goods--Rum ...................................................... 14

        4. Bacardi's Pre-Existing Knowledge of Lodestar's U.S. Trademark Registrations ...................................... 15

        5. Lodestar's Continued Prominent Use of UNTAMED on Rum Products In the United States During The Infringement Period ................................................. 16

    F. Lodestar's Enforcement Efforts Against Bacardi .............................. 19

    G. Lodestar's Survey Expert Finds Evidence of Legally Significant Consumer Confusion Between UNTAMED and BACARDI UNTAMEABLE for Use With Rum .............................................. 20

    H. Summary of Expert Testimony Meaning of UNTAMED Mark and Bacardi's Infringing Use ........................................................ 22

    I. Summary of Expert Testimony on Damages ..................................... 25

J.    The District Court's Summary Judgment Ruling ............................... 26

IV.    SUMMARY OF THE ARGUMENT ................................................. 31

V.    ARGUMENT ................................................................................... 33

    A.    The Standard of Review Is *De Novo* ...................................... 33

    B.    The District Court Erred In Holding That The Existence Of Infringement Cuts-Off And Limits The Trademark Registration Holder's Ability To Enforce Its Rights ...................................... 33

        1.    An Infringer Has No Rights, Should Be Afforded No Legal Presumptions Or Benefits As A Result Of Initiating Infringement, And Should Not Be Encouraged To Infringe ................................................. 33

        2.    The District Court's Ruling Conflicts With Longstanding Ninth Circuit Legal Authority ................................................. 35

        3.    The District Court Usurped the Role of the Jury By Weighing Evidence and Failing to Give Any Weight to Lodestar's Evidence ................................................. 37

        4.    The District Court's Ruling Undermines The Stated Purpose of The Lanham Act, Madrid Protocol Registrations, and Intent-To-Use Applications And Encourages Infringers to Infringe As Soon As Possible .......... 40

    C.    The District Court Erred In Holding That UNTAMED For Use With Rum Is Conceptually Weak As A Matter of Law. .................... 46

    D.    The District Court Erred In Ruling That UNTAMED and UNTAMEABLE For Rum Are Not Similar In Sight, Sound, and Meaning. ................................................................ 53

    E.    The District Court Erred In Ruling That the Intent Factor Is Neutral ................................................................ 56

    F.    The District Court Erred In Ruling That Lodestar Is Not Legally Entitled To Damages ................................................. 57

VI.    REQUEST FOR REASSIGNMENT ON REMAND ................................. 61

VII.    CONCLUSION ................................................................ 63

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adidas Am., Inc. v. Payless Shoesource, Inc.*,
  No. CV 01-1655-KI, 2008 WL 4279812 (D. Ore. Sept. 12, 2008)..............64, 65

*Aktieselskabet AF 21 November 2001 v. Fame Jeans, Inc.*,
  525 F.3d 8 (D.C. Cir. 2008) ................................................................48

*Americana Trading, Inc. v. Russ Berrie & Co.*,
  966 F.2d 1284 (9th Cir.1992) ...............................................53, 58, 59

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) ........................................9, 34, 35, 38, 41

*Bauer Bros., LLC v. Nike, Inc.*,
  159 F. Supp. 3d 1202 (S.D. Cal. 2016) ............................................64

*Chance v. Pac-Tel Teletrac, Inc.*,
  242 F.3d 1151 (9th Cir. 2001) ........................................................42

*Cherokee Inc. v. Wilson Sporting Goods Co.*,
  CV 15-04023.................................................................................59

*Dep't of Parks and Recreation for the State of Cal. v.
  Bazaar Del Mundo Inc.*,
  448 F.3d 1118 (9th Cir. 2006) ...................................................42, 63

*Dr. Edwin "Buzz" Aldrin v. Bacardi-Martini USA, et al.*,
  Case No. 98-544 LHM (C.D. Cal.) (Complaint filed June 23, 1998) ...............21

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
  142 F.3d 1127 (9th Cir. 1998) .............................................10, 11, 39

*Grand Time Corp. v. Watch Factory Corp.*,
  No. 3:08-CV-1770-K, 2011 WL 2412960
  (N.D. Tex. June 10, 2011) ...............................................................44

*Lahoti v. VeriCheck, Inc.*,
  586 F.3d 1190 (9th Cir. 2009) .........................................................53

iii

*Marketquest Grp., Inc. v. BIC Corp.*,
  862 F.3d 927 (9th Cir. 2017) ............................................................... 62

*Parfums Givenchy, Inc. v. Drug Emporium, Inc.*,
  38 F.3d 477 (9th Cir. 1994) ................................................................. 47

*QS Wholesale, Inc. v. World Mktg., Inc.*,
  No. 12-CV-0451, 2013 WL 1953719 (C.D. Cal. May 9, 2013) .................. 65, 66

*Quia Corp. v. Mattel, Inc.*,
  No. 10-1902 JF HRL, 2011 WL 2749576 (N.D. Cal. July 14, 2011) .............. 64

*Rhoades v. Avon Prods. Inc.*,
  504, F.3d 1151, 1165 (9th Cir. 2007) ....................................................... 67, 68

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992) ................................................................. 40

*Sands, Taylor & Wood Co. v. Quaker Oats*,
  No. 84 C 8075, 1995 WL 221871 (N.D. Ill. Apr. 12, 1995) ............................ 64

*Sands, Taylor, & Wood v. Quaker Oats Co.*,
  34 F.3d 1340 (7th Cir. 1994) ................................................................. 64

*Surfvivor Media, Inc. v. Survivor Prods.*,
  406 F.3d 625 (9th Cir. 2005) ................................................................. 39

*to Sazerac Co. v. Fetzer Vineyards, Inc.*,
  265 F. Supp. 3d 1013 (N.D. Cal. 2017) ..................................................... 56

*Warnervision Entm't v. Empire of Carolina, Inc.*,
  101 F.3d 259 (2d Cir. 1996) ................................................................. 49

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
  602 F.3d 1108 (9th Cir. 2010) ................................................... 39, 52, 53, 57, 58

**Statutes**

15 U.S.C. § 1057(c) ............................................................................. 40

15 U.S.C. § 1072 .......................................................................... 40, 63

15 U.S.C. § 1127 ............................................................................... 42

15 U.S.C. § 1141k ........................................................................ 15, 48

28 U.S.C. § 1291 ..................................................................................8

28 U.S.C. §§ 1331, 1338(a), and 1367 ...................................................8

28 U.S.C. § 2106 ...............................................................................67

Lanham Act ...........................................................8, 10, 33, 38, 46, 52

Lanham Act amendments ....................................................................48

Lanham Act Section 66(a), 15 U.S.C. § 1141 *et seq.* ......................15, 48

**Other Authorities**

Federal Rules of Civil Procedure Rule 54 .............................................8

Senate Report 106-249, Madrid Protocol Implementation Act,
   March 27, 2000, 106th Congress (1999-2000)..................................51

## I.   STATEMENT OF JURISDICTION

### A.   Basis For District Court's Subject Matter Jurisdiction

Subject matter jurisdiction in the district court was proper pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

### B.   Basis For the Court of Appeals' Jurisdiction

This Court has jurisdiction to hear an appeal of a final judgment of a district court pursuant to 28 U.S.C. § 1291.

### C.   Final Judgment Was Entered By The District Court

On July 23, 2019, pursuant to Rule 54 of the Federal Rules of Civil Procedure, the district court entered a final judgment disposing of all pending claims and counterclaims.  ER 1-2.

### D.   Timeliness Of Appeal

On July 26, 2019, Lodestar filed a timely notice of appeal.  ER 36-37.

## II.   STATEMENT OF ISSUES

1.     Whether it was legal error to hold that in a trademark infringement action, the owner of a federally registered trademark can be barred from relying on trademark use to show likelihood of confusion, where the trademark use occurs after infringement begins.

2.     Whether it was legal error to construe the Lanham Act to hold that an infringer who is a direct competitor may use a confusingly similar (or identical)

trademark of the trademark registration owner, on the same goods, indefinitely, and neither competitor can enjoin the other.

3.    Whether it was legal error to weigh conflicting material evidence and hold there were no triable issues of fact as to the legal conclusion that the mark UNTAMED for use with rum is "conceptually weak" under the *Sleekcraft* test.

4.    Whether it was legal error to weigh conflicting material evidence and hold that there were no triable issues of fact as to the legal conclusion that UNTAMED for rum and UNTAMEABLE for rum are not similar in sight, sound, or meaning as a matter of law under the *Sleekcraft* test.

5.    Whether it was legal error to hold that where the alleged infringer admits actual knowledge of the trademark holder's existing registrations prior to use, that this factor does not weigh in favor of likelihood of confusion.

6.    Whether it was legal error to hold that a trademark owner who had previously licensed its mark to a related party and whose business model was created around an intent to license its mark, is estopped as a matter of law, from seeking to recover damages in the form of reasonable royalties.

7.  Whether a plaintiff must prove evidence of actual confusion in order to be eligible to recover trademark damages based on corrective advertising.

## III.   STATEMENT OF THE CASE

### A.   Nature of the Case

Appellant/Plaintiff Lodestar Anstalt ("Lodestar") is a small, independent developer of beverages, including award-winning whiskey and rum. Lodestar's business model is to independently create and develop innovative and unique brands of premium products in areas of growth which can be monetized by selling or licensing to a larger entity, who will purchase such innovation instead of creating it internally.

Lodestar owns a U.S. trademark registration for the word mark UNTAMED for rum. Lodestar alleges Defendants Bacardi & Co., Ltd., Bacardi USA, and Bacardi Limited's ("Bacardi") later use of UNTAMEABLE, also for rum, constitutes reverse trademark confusion under the Lanham Act. "The archetypical case of reverse confusion occurs when the junior user," here Bacardi, "is a larger company which, prior to its nationwide launch, discovers a small (usually regional) senior user with a very similar mark in a related field." 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed.) (internal quotations and footnotes omitted); *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998). The junior user "saturates the market and overwhelms the senior user. The result is that the senior user loses the value of the trademark, its product

identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Id.* (internal quotations and footnotes omitted).

### B. Lodestar And Its Critically Acclaimed Spirits

Andre' Levy, the Chairman of Lodestar, developed a unique spirits brand and advertising campaign centered around a premium alcohol product line. Mr. Levy, on behalf of Lodestar, developed the brand in connection with the story of the Wild Geese, the name given to the Irish Diaspora who were forced to leave Ireland in 1691. Lodestar developed and used the trademark UNTAMED in connection with this ad campaign, both alongside the Wild Geese trademark, and prominently as a standalone trademark. Lodestar's Wild Geese story includes the themes of defiance and freedom in the face of exile. ER 406 at ¶ 4.

Lodestar is a trademark holding company. ER 352 at 17: 19-22. Related company Avalon is the exclusive licensor for the UNTAMED mark for distribution of Lodestar's spirits. ER 355 at 30:17-19. Another related company, Protégé, managed by Mr. Levy, develops the brands on behalf of Lodestar. ER 353-354 at 27:25-28:9. Mr. Levy, the Chairman of Lodestar, has overall responsibility for quality control, trademark enforcement, business strategy, and brand development for the Wild Geese line of products and the use of the UNTAMED mark. ER 356 at 58:12-25. Mr. Levy testified that at least $5 million has been invested into the

creation, development, and promotion of the UNTAMED marks and products for the benefit of Lodestar.  ER 52 at ¶ 15.

Lodestar's Wild Geese spirits collection is critically acclaimed and has received numerous awards including:

- "XP [Expert Panel] Gold" 2013 Miami Rum Renaissance for Golden Rum;

- "Gold" and "Silver" medals at WSWA (Wine and Spirits Wholesaler's Association of America) in 2013 for the premium and golden rums;

- "Gold" medals by the Beverage Tasting Institute in 2013 for both golden and premium rum;

- "Double Gold" at the Madrid Rum Renaissance in 2013 for golden rum and premium rum;

- "World's Best Vodka" for its UNTAMED Irish Vodka from the 2016 World Vodka Awards;

- "Best Gold Rum" for The Wild Geese Golden Rum from the 2015 World Rum Awards;

- "Gold" for The Wild Geese Golden Rum from the 2015 San Francisco World Spirits Competition;

109632154.6

- "Best Contemporary Gin" for The Exiles Irish Gin from the 2016 World Gin Awards;

- Best Irish Whiskey (WSWA 2010), Best Non-Aged Irish Malt (WSWA 2011), a rare Double Gold Medal (WSWA 2010), and the Gold Medal (The Spirits Business 'Masters of Whiskey' Challenge), for the Single Malt Whiskey;

- Platinum Medal and Best in Class (SIP Awards, San Diego July 2011) for the Limited Edition Whiskey;

- Gold Medal (Drinks International Cocktail Challenge), Silver Medal (IWSC, July 2011), 4-Star 'Highly Recommended' (Paul Pacult, Spirits Journal), and the Silver Medal (WSWA 2010) for the Rare Irish Whiskey.

ER 409-410 at ¶ 11.

### C.    <u>Lodestar's Business and Licensing Model</u>

Lodestar's business model is to independently create and develop innovative and unique brands of premium products in areas of growth which can be monetized by selling or licensing to a larger entity, who will purchase such innovation instead of creating it internally. ER 406 at ¶ 3.

Prior to 2018, as part of the exclusive license between Lodestar and Avalon, if Lodestar was able to sell the Wild Geese/UNTAMED brand to a third party,

7

Lodestar would have received 90% of the profits from the sale and Avalon would have received 10%. ER 357-358 at 468:21-469:12. In 2018, Lodestar and Avalon amended the agreement such that in the event of the sale of the brand to a third party, Lodestar would have received 10% of the profits and Avalon would have received 90%. ER 361 at ¶ 2.6. In addition, under the 2018 amendment, Avalon was required to pay an ongoing royalty of 10% of net sales, for product sales under the mark. *Id.* at ¶ 2.1.

Lodestar's alcohol industry licensing expert Sidney P. Blum, a certified public accountant who formerly served as the U.S. trademark licensing royalty auditor for Diageo (the world's largest alcohol spirits company), opined that in the alcohol industry, it is common for large companies such as Diageo and Bacardi to acquire smaller companies and brands through payment of royalties or outright purchase. ER 123-124 at ¶¶ 42-46. Mr. Blum also noted that Bacardi itself has a long history of purchasing smaller alcohol companies. ER 125 at ¶¶ 47-50.

Mr. Levy, Lodestar's Chairman, has a history of success in this regard. Mr. Levy previously developed a trademark and advertising campaign centered on the ROUTE 66 trademark for use on cigarette and cigar products. Despite modest sales, Mr. Levy was able to monetize this trademark and brand by licensing it for a substantial upfront payment exceeding $14 million to a larger company in Europe, along with a running royalty which averaged over $1 million per year for 20 years.

ER 409 at ¶ 9.

### D. Lodestar's United States Trademark Rights, Trademark Priority, and Trademark Registration

On August 19, 2009, Lodestar filed a trademark application with the United States Patent and Trademark Office (USPTO) for the UNTAMED word mark for rum, whiskey, distilled spirits, and other alcohol products. ER 406 at ¶ 2; ER 412-415. On October 4, 2011, the application matured into United States Trademark Registration No. 4,033,239 (the "'239 Registration"), located on the Principal Register, for the mark UNTAMED in International Class 33 for the goods of alcoholic beverages, namely, rum, whiskey, and distilled spirits. The '239 Registration is based on a foreign registration pursuant to Section 66(a) of the Lanham Act, 15 U.S.C. § 1141 *et seq.* (the Madrid Protocol). ER 47-48 at Fact No. 20; ER 412-413. Lodestar's '239 Registration has a stated priority date of July 16, 2009. ER 412-415. Under the Madrid Protocol, evidence of trademark use is not required before obtaining a U.S. Registration. 15 U.S.C. § 1141k. Once a U.S. Trademark Registration issues based on a Madrid Protocol-based application, "it is treated much the same as any other registration on the Principal Register." 3 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 19:31.60 (citing *Dragon Bleu (SARL) v. VENM, LLC*, 112 U.S.P.Q.2d 1925, 1930 (T.T.A.B. 2014)).

**E.** **Lodestar's Use of its UNTAMED Mark in the United States**

    **1.** **Lodestar's Use of UNTAMED in The U.S. on Whiskey Prior To Bacardi's Infringement**

In April 2009, over 1,500 cases of whiskey with a value exceeding $180,000 bearing the UNTAMED design and word mark[1] were sold into the U.S. ER 50 at ¶ 2; ER 54-73

In January 2010, over 2,100 cases of whiskey with a value exceeding a quarter of a million dollars bearing the UNTAMED design and word mark were sold into the U.S. ER 50 at ¶ 3; ER 54-73.

These 3,600-plus cases of whiskey bearing the UNTAMED design and word mark and additional shipments since then have been continuously for sale in the U.S. ever since, more than ten years of continuous use. ER 50 at ¶ 4; ER 54-73.

    **2.** **Lodestar's Prominent Use of UNTAMED on Rum in U.S. Prior to Bacardi's Infringement**

As early as September and October 2012, Lodestar published advertisements in Moodie Report and TR Business (targeting and seen by U.S. residents) advertising Lodestar's rum under the prominent UNTAMED word mark. ER 407-408 at ¶ 8; ER 50 at ¶ 5.

---

[1] The USPTO accepted a specimen of use of a related design mark (which includes the word mark UNTAMED) as evidence of use of both the design and word marks. ER 378 at ¶ 7; ER 404

109632154.6

 

Lodestar has consistently promoted its products, including products sold under its UNTAMED mark on social media and YouTube. ER 409 at ¶ 10; https://www.youtube.com/channel/UCSMzqCcK_iwe1dIgVG8YHdw

On February 14, 2013, the U.S. Alcohol and Tobacco Tax and Trade Bureau, a division of the U.S. Dept. of Treasury (TTB) issued and approved a certificate of label application (COLA) for Lodestar's Premium Rum for the U.S. which includes use of the UNTAMED word mark with ® symbol. ER 50 at ¶ 6.

On March 1, 2013, the TTB issued and approved a COLA for Lodestar's Golden Rum for the U.S. which includes use of the UNTAMED word mark with ® symbol as shown below. ER 50-51 at ¶ 7; ER 82.

On April 15-21, 2013, Lodestar's Premium and Golden Rum products were shown, offered to, and tasted by customers in the United States and offered for distribution in the United States at the 2013 Rum Renaissance Trade Show in Miami, FL. ER 51 at ¶ 8; ER 84-92. The UNTAMED mark was prominently featured at the location where the product was tasted by consumers, distributors, and expert judges in connection with large advertising and promotion using the prominent depiction of the UNTAMED mark. [*Id.*]

11





**UNTAMED on portion of label of Premium Rum**     **UNTAMED on portion of label of Golden Rum**

12

ER 51-52 at ¶¶ 8, 11.[2]

During this tasting event, Protégé, on behalf of Lodestar, solicited candidates for a brand ambassador and had discussions with U.S. distributors for Lodestar's Golden and Premium Rum products sold under the UNTAMED mark. [*Id.*]  Mr. Levy testified that: "the whole purpose of going to the Miami Rum Renaissance was twofold: Was to expose the products to the consumer in terms of the actual ultimate consumer-consumer, as well as our consumers, which were the distributors and wholesalers.  So there was a dual purpose to that."  ER 145 at ¶ 5; ER 148 at 663:9-17.

Lodestar's Golden Rum was awarded a prestigious Gold Medal at the show. ER 51 at ¶ 8.[3]  The labels on the bottles provided to consumers used the UNTAMED word mark and noted that "Untamed" is a "registered trademark[]." ER 51-52 at ¶ 11.

In addition, Lodestar published an advertisement in the brochure during the 2013 Rum Renaissance Trade Show prominently featuring the UNTAMED mark in connection with its rum products offered at the trade show.  ER 407-408 at ¶ 8.

---

[2] The "Wild Geese" story appears in connection with the UNTAMED mark on these labels that were used at the same Miami trade show where Bacardi attended.

[3] Bacardi was awarded a silver medal at the same show.

13



On June 6-7, 2013, Lodestar's U.S. importer/distributor MHW shipped samples of Lodestar's Premium and Golden Rums in the U.S. bearing the UNTAMED word mark to customers. ER 372-373; ER 154 at ¶ 28; ER 374-376.

August 15, 2013, MHW shipped samples of Lodestar's Premium and Golden Rums in the U.S. bearing the UNTAMED word mark to customers. ER 372.

### 3.   Bacardi's Confusingly Similar Mark on The Same Goods--Rum

During late 2012 and early 2013, Bacardi was apparently struggling to rebrand itself in light of reported negative consumer perceptions about the Bacardi brand and customers and weak brand equity. According to Bacardi's own advertising agency, Bacardi rum, which at one point was purportedly 70% of Bacardi's business, was "losing market share to competitors like Havana Club and Captain Morgan" and a change in approach and mind-set was needed." ER 522. Rather than come up with an original campaign, Bacardi worked with an outside advertising agency and they developed a trademark and ad campaign that appears

to be copied and pasted, with minor modifications, from Lodestar's existing UNTAMED brand and ad campaign. Bacardi's campaign features the mark "UNTAMEABLE," also associated with rum. Curiously, the Bacardi UNTAMEABLE campaign conveys a nearly identical story as Lodestar's UNTAMED campaign, including the same concepts of defiance and freedom in the face of exile.[45]

 

### 4. Bacardi's Pre-Existing Knowledge of Lodestar's U.S. Trademark Registrations

On January 17, 2013, unbeknownst at the time to Lodestar, Bacardi's

---

[4] As alleged in the Complaint, Bacardi has a history of being accused of stealing other smaller company's marketing campaigns, including being accused of stealing the main concept from the San Francisco Cacophony Society Breakers to Bay event for a Bacardi ad, without permission. ER 574 at ¶ 35. Bacardi was also previously sued by Buzz Aldrin, who accused Bacardi of taking an iconic image of Buzz Aldrin, without permission, and altering it so that Dr. Aldrin appears to be wearing swim trunks and his "body is bathed in Bacardi rum." *Dr. Edwin "Buzz" Aldrin v. Bacardi-Martini USA, et al*., Case No. 98-544 LHM (EEx) (C.D. Cal.) (Complaint filed June 23, 1998).

[5] Bacardi's claim that Lodestar developed its ad campaign after Bacardi is not supported by any evidence. All of the elements in the above ad were created and shown, for example, at the 2013 Miami Rum Renaissance, where Bacardi attended, seven months before Bacardi introduced its Untameable campaign.

15

General Counsel of Intellectual Property analyzed a trademark clearance search which revealed to Bacardi that Lodestar already owned trademark registrations in the United States (and throughout the world) for the UNTAMED word and design marks for use with rum, whiskey, distilled spirits, (and other alcohol products) and these registrations were owned by Lodestar Anstalt. ER 666-667 at 15:25-16:2; ER 667 at 16:18-19; ER 673-674 at 71:18-72:13; ER 675-676 at 131:17-132:5; ER 380-381, ER 386-403. Bacardi does not rely on advice of counsel as a defense and has chosen to withhold any opinions of counsel related to the trademark clearance searches.

Despite the existence of Lodestar's U.S. Registration for the UNTAMED word mark for rum, issued on October 4, 2011, with a stated priority date of July 16, 2009, Bacardi, in late November 2013, launched its confusingly similar UNTAMEABLE ad campaign for rum products. ER 349-350. Bacardi asserts it stopped using UNTAMEABLE by December 2017. ER 652.

## 5. Lodestar's Continued Prominent Use of UNTAMED on Rum Products In the United States During The Infringement Period

During the period of alleged infringement, Lodestar continued its use of UNTAMED with rum. On December 3, 2013, MHW shipped samples of

Lodestar's Premium and Golden Rums in the U.S. bearing the UNTAMED word mark to customers. ER 373.

A few months later, Lodestar introduced its UNTAMED Revolutionary Rum into the U.S. market. On January 14, 2014, Lodestar applied for a COLA for its UNTAMED Revolutionary Rum. ER 52 at ¶ 12; ER 94-96. It was approved on March 5, 2014. [*Id.*]

On April 3, 2014, Lodestar sold into the United States 555 cases of UNTAMED Golden Rum. ER 39 at ¶ 2; ER 41-45.

On April 11, 2014, Lodestar sold into the United States 2000 cases of UNTAMED Revolutionary Rum. ER 52 at ¶ 13; ER 97-104; ER 13.

 



On August 25, 2014, Lodestar sold into the United States 419 cases of UNTAMED Premium Rum. ER 52 at ¶ 14; ER 105-111.

On August 6, 2014, Lodestar's U.S. importer MHW provided a sample of the UNTAMED Revolutionary Rum to a customer. ER 374-376.

On December 29, 2014, 96 cases of UNTAMED Revolutionary Rum, 96 cases of UNTAMED Premium Rum, and 96 Cases of Golden Rum were sold by MHW to distributor Central States Beverage, who in turn sold those products to numerous retail outlets in the United States. ER 480-520.

Lodestar's UNTAMED Revolutionary Rum products are sold side-by-side Bacardi rum products at the retail level. ER 471-479.

Since well before 2014, Lodestar was in the process of developing a cask strength non chill filtered rum and whiskey for the U.S. market to be sold under the UNTAMED marks. ER 410 at ¶ 15. On November 30, 2018 the TTB issued and approved a new COLA for UNTAMED Non Chill Filtered Cask Strength Rum. *Id.;* ER 416-419. And on December 17, 2018, the TTB issued and approved a new COLA Non Chill Filtered Cask Strength Whiskey. *Id.*

From January 1, 2019 through May 3, 2019, 241 cases of UNTAMED Revolutionary Rum have been sold to customers in the United States. ER 410 at ¶ 14.

109632154.6

In addition, Lodestar's UNTAMED whiskey and rum products were recently promoted and offered for distribution in the United States in connection with the UNTAMED word mark at the recent Wine and Spirits Wholesalers of America (WSWA) Convention in Orlando, FL which took place on March 31-April 3, 2019 as shown below.  ER 410-411 at ¶ 17.

 

### F.    Lodestar's Enforcement Efforts Against Bacardi

Lodestar did not immediately file an infringement action against the much larger Bacardi, but first attempted other means to persuade Bacardi to stop using the confusingly similar UNTAMEABLE mark in connection with rum.  In July of 2013, Bacardi attempted to register the mark BACARDI UNTAMEABLE in the United States based on the Madrid Protocol. *See* Trademark Serial Number

109632154.6

79135542.[6] Lodestar first filed a letter of protest with the USPTO and then filed a Notice of Opposition on April 29, 2014 to Bacardi's pending trademark application, which at that point had been published for opposition. *See Lodestar Anstalt v. Bacardi & Co.*, Opp'n No. 91216163 (T.T.A.B.) (currently suspended).[7] Bacardi, however, refused to stop using the confusingly similar mark and in 2016, Lodestar filed an infringement action in the Central District of California against three named Bacardi Defendants.

**G.** **Lodestar's Survey Expert Finds Evidence of Legally Significant Consumer Confusion Between UNTAMED and BACARDI UNTAMEABLE for Use With Rum.**

Bacardi's survey expert Sarah Butler conducted a likelihood of confusion survey that was produced by Bacardi in the litigation. For the Lodestar rum product, Ms. Butler showed the respondents an image of a product where the word UNTAMED appeared only at the bottom of the back label of the bottle of rum, was preceded by dense text, and in the particular image she used, the word UNTAMED

---

[6] This application remains pending. In this action, Bacardi now claims that "UNTAMED" and "UNTAMEABLE" are descriptive, yet the fact that Bacardi sought trademark protection is evidence that Bacardi considers UNTAMEABLE to not be descriptive.

[7] Mr. Levy also launched an online campaign to highlight the bullying tactics used by Bacardi to steal smaller entrepreneurial companies' ideas. *See, e.g.,* https://www.thespiritsbusiness.com/2014/04/avalon-group-launches-campaign-against-bacardi/. Mr. Levy later published a series of open letters to Bacardi, again to highlight Bacardi's trademark bullying tactics.

109632154.6

was "overlaid by black shading that makes it difficult to read the entire word." ER 428-429. For Bacardi, she did not show the survey respondents the prominent print ad used mainly by Bacardi (*see, e.g.,* ER 10), but instead showed the survey respondents a 60 second commercial where the BACARDI UNTAMEABLE mark was shown for approximately 3 seconds of the commercial. ER 428 at ¶ 9. Despite these limitations, Ms. Butler's survey still found an overall net confusion at the rate of 6% between UNTAMED and BACARDI UNTAMEABLE for rum products. ER 427-428 at ¶ 9.

Lodestar's rebuttal survey expert, Dr. Carol A. Scott, who holds a Ph.D. in Marketing from Northwestern University, opined that the images selected by Ms. Butler for her survey "make it difficult to reliably generalize its findings to the marketplace and to the target market for Plaintiff's products." ER 428-429 at ¶ 10. Dr. Scott replicated Ms. Butler's survey "using Ms. Butler's survey questionnaire and the same methodology" with three exceptions: (1) Dr. Scott showed the respondents a high resolution image of a print ad for Bacardi, the image of which is virtually identical to the main image prominently used by Bacardi on social media and elsewhere during the Bacardi campaign; (2) Dr. Scott used an Untamed Revolutionary Rum bottle from Lodestar sold during the infringement period, where UNTAMED can be clearly seen on the front of the bottle; and (3) Dr. Scott showed the respondents only the front of the Lodestar rum bottle "as there was no

21

need to show the back label in order to expose respondents to the UNTAMED mark." ER 429-430 at ¶ 12.

The results of Dr. Scott's survey using, in her opinion, more appropriate images from which to reliably generalize the findings to the marketplace and to the target market for the products, yielded a result of *18.6%* net confusion between the UNTAMED and BACARDI UNTAMEABLE marks with respect to rum, which Dr. Scott concludes is a "significant level of confusion." ER 433.

## H. **Summary of Expert Testimony Meaning of UNTAMED Mark and Bacardi's Infringing Use**

During the litigation, Lodestar also relied on the expert testimony of Dr. Robert Leonard, a tenured Professor of Linguistics at Hofstra University, who holds a Ph.D. in Linguistics from Columbia University and has previously applied linguistic scientific principles in a number of trademark matters. ER 436-470.

Dr. Leonard opined that the trademarks UNTAMED and UNTAMEABLE "are highly similar in sight and sound, and are almost identical in meaning." ER 440 at ¶ 12. Dr. Leonard opined as to sight that the greater proportions of UNTAMED and UNTAMEABLE (i.e., *untame*) are identical in letter count and the visual presentation of UNTAMEABLE with an "e" after the "m" makes them especially similar. ER 468-469. Dr. Leonard opined that as to sound, the greater proportion of the marks are identical in phonemic inventory and share the identical

22

stress pattern when they are pronounced. ER 448. As to meaning, UNTAMED and UNTAMEABLE share a common root *tame* and share a close semantic relationship; "something UNTAMEABLE must also be UNTAMED." [*Id.*]

Dr. Leonard also opined that the terms UNTAMED and UNTAMEABLE "clearly do not describe or even suggest any aspects of liquor, making the relation between the terms and the products for which they are used, namely rum, arbitrary." [*Id.*]

Dr. Leonard examined and analyzed the meaning of these words using the concepts of entailment, collocation, and semantic preference. Entailment is a relationship between two concepts or sentences where if the first is true, then the second must also be true. Using this analysis, Dr. Leonard concluded that "there is close semantic relationship between the terms *untameable* and *untamed*, wherein speakers will understand that an entity that has a lack of ability to ever be *tamed* also means that that entity is currently *untamed*: something UNTAMEABLE must also be UNTAMED." ER 450-451.

Collocation is the meaningful relationship between two or more words that frequently co-occur in close proximity to one another. ER 451. A "semantic preference" is the relation between a node word, such as tame, and lexical sets of semantically related words. For example, "the semantic preference of the term *glass,* when used as a vessel with which to drink, will produce collocates related to

109632154.6

liquids such as *beer, milk,* and *water,* and not, say, *meats.*" *Id.* Dr. Leonard performed a "collocate" search for tame/untamed/untameable and found that these terms appear in one primary semantic category: nature. Dr. Leonard concludes that in the present case, UNTAMED and UNTAMEABLE refer to a manufactured alcohol, such as rum, which does not appear in the preferred semantic category of nature and opines that "the terms UNTAMED and UNTAMEABLE clearly do not describe the product – namely rum." ER 453.

Finally, Dr. Leonard analyzed how the words were used by consumers, and by Bacardi. Dr. Leonard found numerous examples where consumers used the word UNTAMED to refer to the Bacardi UNTAMEABLE campaign, and noted instances where Bacardi itself used "untamed" on social media in connection with its UNTAMEABLE campaign, blasted out to its nine million-plus Facebook followers. ER 453-466. Dr. Leonard also noted that a Bacardi Senior Brand Manager admitted that "people may try to shorthand" UNTAMED for UNTAMEABLE. ER 453. Dr. Leonard concluded that in online and social media use, "there is evidence that consumers associate the term UNTAMED with the UNTAMEABLE campaign. This occurs even when BACARDI UNTAMEABLE is visually present in a corresponding image or advertisement." ER 469-470.

Bacardi failed to offer any rebuttal expert testimony.

## I.    <u>Summary of Expert Testimony on Damages</u>

As for damages in a reverse trademark confusion case, Lodestar relies on the expert testimony of Dr. Barbara C. Luna, who is a Certified Public Accountant and holds a BA degree from Wellesley College in Physics, and an MS and PhD from Harvard University in Applied Math. ER 642 at ¶ 7.

Dr. Luna opined that to the extent there is a finding a likelihood of confusion, Lodestar's damages can be determined by the application of a reasonable royalty rate on Bacardi's net sales in the United States that have been realized through Bacardi's use of the UNTAMEABLE mark. ER 653.  Dr. Luna performed a detailed analysis of a hypothetical negotiation using the relevant *Georgia-Pacific* factors which can be used in determining damages in trademark infringement cases involving allegations of reverse confusion.   ER 654.   For example, Dr. Luna considered published licensing royalty rates for corporate brand properties during the relevant time period which is 3-6% for rum.  Dr. Luna also considered comparable licensing agreements from the RoyaltyStat and RoyaltySource databases for International Class 33 and considered the range: 1% to 20% and the median 5% and average 7.33%.   Dr. Luna also considered Lodestar's current license agreement with Avalon which is a royalty of 10%.  Dr. Luna also considered the nature and scope of the hypothetical agreement, Lodestar's intent to find a large company to be an exclusive user, the profitability

of the mark, Bacardi's stated gross profit, the proposed use by Bacardi, Bacardi's past history of acquiring smaller brands, and many other relevant factors, and concluded that an overall reasonable royalty rate of 2% of net sales.   ER 658-659.

As explained above, Lodestar also relies on the expert testimony of Sidney Blum, who has expertise and experience with licensing in the alcohol industry and who opined that in the context of determining a reasonable royalty based on a hypothetical negotiation, it is reasonable to expect that a large international alcohol company would consider licensing or acquiring a smaller alcohol company or brand.  ER 123.  Mr. Blum also opined it is difficult to find public information on comparable license agreements as most such agreements are not  made public. ER 126.  Mr. Blum stated that for alcohol license agreements he was involved in with Diageo that were no longer confidential, the royalty rate was between 4-5% of net sales.  ER 128.  Mr. Blum also testified that based on his background and experience, that 3-4% is a reasonable starting royalty rate to determine a hypothetical royalty rate for a trademark licensing agreement involving rum.  *Id.*

## J.   The District Court's Summary Judgment Ruling

Lodestar and Bacardi filed cross motions for summary judgment as to likelihood of confusion (and other issues including abandonment).  The District Court granted Bacardi's motion for summary judgment as to no likelihood of confusion and denied Lodestar's motion as to infringement. ER 3-35.  Despite the

fact that Lodestar has trademark priority over Bacardi based on Lodestar's registration listed on the Principal Register four years before Bacardi's infringing use began, the district court held that the infringing acts by Bacardi cut-off Lodestar's ability to introduce new products and prove likelihood of confusion where Lodestar's product was first sold under the mark after Bacardi's alleged infringement began. ER 19-20. Lodestar is aware of no other legal decision ever affording rights to an *infringer* and cutting off the rights of a trademark holder to offer new products, based on the timing of the *infringer's* actions.[8] The district court held that "the relevant products for purposes of determining likelihood of confusion are Lodestar's products "as they existed prior to" the infringement. ER 19. The district court reasoned that, despite trademark priority over Bacardi, because Lodestar used its own UNTAMED word mark in "large font on the front label of its rum products" for the first time after Bacardi's infringing use began, "the goals of trademark law would not be served" by allowing Lodestar to show likelihood of confusion with evidence of use of its own mark on the goods claimed by the registration, which were sold during the same time as accused Bacardi products were sold. ER 20.

The effect of the district court's ruling limiting a trademark holders rights

---

[8] The district court also notes that it was not able to find any such cases either, and apparently created this new limitation from whole cloth, without considering how such a rule would further the purpose of the Lanham Act.

and benefitting an infringer, is to encourage infringement as soon as possible to cut off the trademark holder's rights. If adopted by this Court, it will lead to the absurd result where two competitors who both sell rum products and who use confusingly similar (or even identical) marks on these identical rum products, may never be able to stop the other from such use, especially where the trademark holder filed an intent to use or Madrid Protocol application which does not require use before acquiring rights under the current settled law. The district court contends this result, that two parties can sell the same product under the same mark, somehow furthers the "goals of trademark law" ER 20.

As to the *Sleekcraft* factor regarding the conceptual strength of the mark, the district court notes that Lodestar's linguistic expert Dr. Leonard opines that UNTAMED does not describe or suggest liquor (based on a thorough linguistic analysis) and is therefore conceptually strong. ER 20. Bacardi offered no rebuttal expert. Instead, Bacardi's outside counsel attempted to provide his own evidence of what he claimed were third party promotional materials which he claimed demonstrated use of the word "untamed" to describe alcohol. ER 21. The district court, over Lodestar's evidentiary objections, found that Bacardi's purported evidence "contradicts Dr. Leonard's opinion." *Id.* Despite the presumption that the "UNTAMED word mark is presumptively strong because it is federally registered," the district court improperly weights evidence as a decider of fact,

does not give weight to the expert report, does not give weight to the legal presumption of strength of the mark, fails to draw all reasonable inferences in favor of Lodestar, and the district court *weighs* the "contradict[ory]" evidence in favor of the moving party, concluding that the UNTAMED mark for rum "is not particularly distinctive" at least in the court's mind, and therefore holds "this factor weighs against confusion because Lodestar's UNTAMED word mark is conceptually weak." ER 22.

As to the similarity of the marks *Sleekcraft* factor, the district court states that while Lodestar's evidence shows that "some people mistakenly used 'Untamed' in place of 'Untameable' when posting about Bacardi on social media," the district court again weighs evidence and concludes this is "unremarkable" and gives it no weight. *Id*. at 22 of 33. The district court notes that Dr. Leonard opines that UNTAMED and UNTAMEABLE "are highly similar in sight and sound, and are almost identical in meaning." ER 24. Again the district court improperly weighs conflicting evidence, fails to draw all reasonable inferences in favor of Lodestar, and makes factual determinations of conflicting evidence couched as "observ[ation]s" that UNTAMED and UNTAMEABLE "do not share the same meaning because the word 'untamed' describes something that has not been tamed while the word 'untameable' describes something that is not capable of being tamed." *Id*. The district court also states that it gives no weight to Lodestar's

survey expert report because Lodestar's survey expert considered Lodestar's use of UNTAMED "in large font" (ER 20) on the product first sold after the infringement began. ER 25. The district court holds that this factor weighs against a likelihood of confusion. ER 26.

As to the actual confusion factor, the district court does not consider Lodestar's likelihood of confusion survey and does not consider the evidence that "some people mistakenly used 'Untamed' in place of 'Untameable' when posting about Bacardi on social media." ER 24, fn. 5. The district court concludes this factor "weighs slightly against confusion." ER 26.

As to the marketing channels used, despite evidence of overlapping marketing efforts, and that both Bacardi and Lodestar sell their rum products at retail stores to consumers, the district court concludes "this factor weighs slightly against a likelihood of confusion" because Bacardi advertised in additional ways that Lodestar did not. ER 26-27.

As to Bacardi's intent in selecting the mark, while noting that Bacardi had *actual notice* of Lodestar's U.S. trademark registrations "prior to launching the UNTAMEABLE campaign," based on a trademark clearance search, the district court holds this "does not weigh in favor of a likelihood of confusion" based on the district court's own factual findings (again weighing competing evidence) that that

UNTAMED mark was not being used in the U.S. and/or was just used as a "tagline" when the infringement began. ER 27-28.

The district court concludes, again failing to draw all reasonable inferences in favor of the non-moving party, that "notwithstanding the fact that both parties used a variation of the word 'untame' to sell rum products, there is no evidence in the record that a reasonably prudent consumer in the marketplace would have mistakenly affiliated The Wild Geese Soldiers & Heroes rum with Bacardi" and "concludes that a rational trier of fact could only find that Bacardi's use of the UNTAMEABLE mark was not likely to cause customer confusion." ER 28.

Although not necessary for its ruling, the district court also held that Lodestar was required to provide "evidence of a prior license or negotiations with a third party" in order to seek reasonable royalties. ER 31. The district court also held that a plaintiff must prove "actual customer confusion" to be eligible to seek corrective advertising damages and that Lodestar also failed to prove actual damage to goodwill. ER 33. [9]

## IV. <u>SUMMARY OF THE ARGUMENT</u>

The district court committed legal error in granting summary judgment in favor of Bacardi as to no likelihood of confusion and no damages. The district

---

[9] The district court found there were triable issues of fact as to Bacardi's claims of abandonment, but later dismissed the claims for lack of subject matter jurisdiction. ER 1-2. In its summary judgment ruling, the district court also dismissed state court claims premised on a likelihood of confusion. ER 34.

court erred in holding that the actions of an infringer can cut-off or limit a registered trademark owner's ability to enforce its established trademark rights. The district court erred in affording presumptions and benefits in favor of an infringer, based on *when* an infringer commences infringing. No legal authority supports this holding. The district court's ruling results in a situation where two competitors are allowed to use the same mark on the same goods and neither can stop the other. This holding is entirely inconsistent with existing Ninth Circuit law, subverts the underlying purpose of the Lanham Act and the Madrid Protocol, and encourages unscrupulous entrepreneurs to look in the record for intent to use applications or Madrid Protocol registrations, rush in to make a few sales under the same mark, and sue, demanding a large settlement to permit trademark owner to proceed on its plans for use of the mark.

As to the likelihood of confusion analysis, the district court erred in failing to consider the evidence offered by Lodestar, improperly weighing evidence and making credibility determinations, improperly applying the *Sleekcraft* factors, not giving proper weight to legal presumptions in favor of Lodestar, and failing to draw all reasonable inferences in favor of Lodestar.

As to the damages analysis, the district court erred in not considering that Lodestar's entire business model is built around attempting to sell or license its brand to a larger company, for failing to consider the expert testimony and other

32

evidence submitted by Lodestar, and for failing to draw all reasonable inferences in favor of Lodestar.

## V. ARGUMENT

### A. The Standard of Review Is *De Novo*

Where a district court finds no likelihood of confusion as a matter of law, that ruling is reviewed *de novo*. *Dreamwerks Prod. Grp.,* 142 F.3d at 1129. "[A]ll reasonable inferences are to be drawn in favor of the non-moving party." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).

### B. The District Court Erred In Holding That The Existence Of Infringement Cuts-Off And Limits The Trademark Registration Holder's Ability To Enforce Its Rights

#### 1. An Infringer Has No Rights, Should Be Afforded No Legal Presumptions Or Benefits As A Result Of Initiating Infringement, And Should Not Be Encouraged To Infringe

Lodestar is the undisputed owner of the '239 Registration for the word mark UNTAMED for use on rum. Lodestar's federal registration which exists on the Federal Register, provides a "strong presumption" and prima facie evidence that the mark is protectable and is inherently distinctive. *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010). A federal registration is "constructive notice of a claim of ownership so as to eliminate any defense of

33

good faith adoption and use made after the date of registration." McCarthy at §
19:9; 15 U.S.C. § 1072. The registrant is entitled to a priority date or constructive
use date, nationwide in effect, as of the application filing date (15 U.S.C. §
1057(c)). Moreover, Lodestar, as "the senior user, has no obligation to label its
product in such a way as to avoid confusion." *Sands, Taylor & Wood Co. v.
Quaker Oats Co*., 978 F.2d 947, 960 (7th Cir. 1992).

In this case, Bacardi was not only on constructive notice, Bacardi's General
Counsel for Intellectual Property performed a trademark clearance search and was
on actual notice that Lodestar owned the U.S. trademark rights for UNTAMED for
rum in the United States over four years before Bacardi started use of
UNTAMEABLE on rum in the United States. ER 665-666 at 15:25-16:2; ER 666
at 16:18-19; ER 673-674 at 71:18-72:13; ER 675-676 at 131:17-132:5; ER 380-
381, ER 386-403. This eliminates any defense of "good faith adoption." McCarthy
at § 19:9; 15 U.S.C. § 1072. Bacardi's decision to move forward with
UNTAMEABLE on the same product, rum, in the U.S. market, was done with
eyes wide open, and no case law or public policy supports giving the infringer any
presumptions or benefits, especially when on actual notice of the senior user's
existing rights.

The district court premises its holding on its conclusion that the Untamed
Revolutionary Rum, as a factual matter, is not a "fair representation" of Lodestar's

products because that product was not on sale when the infringement began, and the UNTAMED word mark was used in "large font" and "on the front label of its rum products." The district court, however, admittedly found no legal authority to support this ruling limiting "the relevant products for purposes of determining likelihood of confusion" to products "as they existed prior to" the infringement—because there is no such legal authority. ER 19.

## 2. **The District Court's Ruling Conflicts With Longstanding Ninth Circuit Legal Authority**

The District Court's holding is in direct odds with the likelihood of expansion *Sleekcraft* factor. "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979). The district court's holding that "the relevant products for determining likelihood of confusion" are only the products "as they existed prior to the" infringement, is entirely inconsistent with this *Sleekcraft* factor. Had Lodestar not yet used the UNTAMED mark on rum prior to infringement, but intended to do so, under *Sleekcraft*, that evidence should weigh in favor of a likelihood of confusion. Under the district court's ruling, *actual use* during the time of infringement is

deemed not relevant to the likelihood of confusion analysis. No legal authority supports this holding.

Moreover, under longstanding Ninth Circuit law, sales of product to customers in connection with the mark is considered "use" of the mark, regardless of whether a third party has begun infringement. In the Ninth Circuit, the "use in commerce" requirement includes (1) an element of actual use, and (2) an element of display looking at the totality of the circumstances. *Chance v. Pac-Tel Teletrac, Inc.,* 242 F.3d 1151, 1159 (9th Cir. 2001). A "single sale or shipment may be sufficient to support an application to register the mark, providing that [it] . . . has the color of a bona fide transaction and is accompanied or followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade." *Dep't of Parks and Recreation for the State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006). "[A]dvertising combined with other non-sales activity . . . can constitute prior use in commerce." *Id.* (internal citations omitted); *see also* 15 U.S.C. § 1127 (mark is used in commerce when "it is placed in any manner on the goods...or the displays associated therewith or on the tags or labels affixed thereto...") 15 U.S.C. § 1127.

Thus, Lodestar's sale in commerce of thousands of cases of UNTAMED Revolutionary Rum is clearly "use" under well-established Ninth Circuit law and

should be deemed relevant use for likelihood of confusion purposes, with no limitations, regardless of when such sales occurred.

**3.** **The District Court Usurped the Role of the Jury By Weighing Evidence and Failing to Give Any Weight to Lodestar's Evidence**

The factual record before the district court included evidence that Lodestar, prior to infringement, had begun using UNTAMED in a very "large font" in connection with rum before the alleged infringement commenced—even though there is no such "pre-infringement prominent manner of use" requirement.   In April 2013, prior to infringement, Lodestar's UNTAMED mark was displayed prominently, in large font, on a large booth at the Miami Rum Renaissance. Lodestar solicited candidates for a brand ambassador and had discussions with U.S. distributors for its Golden and Premium Rum products. ER 51 at ¶ 8; ER 84-92.   Mr. Levy testified that: "the whole purpose of going to the Miami Rum Renaissance was twofold: Was to expose the products to the consumer in terms of the actual ultimate consumer-consumer, as well as our consumers, which were the distributors and wholesalers. So there was a dual purpose to that." ER 145 at ¶ 5; ER 148 at 663:9-17.   It is undisputed that UNTAMED rum products, with UNTAMED on the label, surrounded by prominent UNTAMED advertising, were tasted by consumers, distributors, expert judges, and the UNTAMED Golden Rum

was awarded a prestigious gold medal. ER 51 at ¶ 8. In fact, one downside to this particular trade show is that "too many consumers [are] out to get drunk." ER 51 at ¶ 10; ER 86.

While there is no legal requirement of actual use prior to infringement for a registration issued under the Madrid Protocol, even if there were such a requirement, admissible evidence before the district demonstrated prominent use, in large fonts, and at the very least, this is a disputed material question of fact for the jury to decide, not the district court on summary judgment.

In addition, Lodestar's U.S. distributor subsequently sent sample bottles of its UNTAMED Golden Rum and UNTAMED Premium Rum to various customers as early as June 2013. ER 372; ER 154 at ¶ 28; ER 374-376. Shipment of samples is a "use in commerce" that is sufficient to support a trademark registration. *See* 3 McCarthy on Trademarks and Unfair Competition § 19:118 (5th ed.) ("A shipment of a prototype portable telephone to an investor/director in applicant company for the investor/director to use and to demonstrate to others is a bona fide transaction which supports a use-based application to register."); *Grand Time Corp. v. Watch Factory Corp.*, No. 3:08-CV-1770-K, 2011 WL 2412960 *6 (N.D. Tex. June 10, 2011) (shipments of samples constitute trademark use; no minimum currency must be exchanged).

Moreover, it was undisputed that Bacardi's rum sold under the UNTAMEABLE mark and Lodestar's UNTAMED Revolutionary Rum were sold during the same time frame. And, the actual *product* itself, golden rum, was sold before and after infringement. The word mark did not change either—Lodestar used the word mark UNTAMED on golden rum before infringement and UNTAMED on golden rum after infringement began. Only the font size on the label and placement on the label changed.

<u>Use of UNTAMED on relevant portion of rum labels prior to infringement</u>

 

<u>Additional use of UNTAMED on relevant portion of rum labels after Bacardi's infringement began</u>



Thus, whether or not the UNTAMED Revolutionary Rum is a "fair representation," if a legal requirement at all, is a question of fact for the jury to

decide. The district court failed to draw all reasonable inferences to Lodestar, the non-moving party.

The district court also appears to place great evidentiary weight on the fact that one internal email mentioned that use of the UNTAMED mark on UNTAMED Revolutionary Rum would "combat" Bacardi's attempts to take over the Untamed mark. ER 19. The district court fails to cite to any legal authority holding that a trademark holder's actions intended to enforce its rights and use its mark should later be held *against* the trademark holder. In fact, failure to police and enforce a trademark can lead to a loss or narrowing of rights. The district court's ruling, however, discourages enforcement, seeks to benefit the infringer, and hinders the trademark holder from seeking to enjoin allegedly infringing use based on the trademark holder's intent to enforce its rights. This ruling is entirely unsupported by legal authority.

4. **The District Court's Ruling Undermines The Stated Purpose of The Lanham Act, Madrid Protocol Registrations, and Intent-To-Use Applications And Encourages Infringers to Infringe As Soon As Possible**

The district court's holding that the "only relevant products for purposes of determining likelihood of confusion" are products "as they existed prior to" infringement (ER 19), would undermine the entire purpose of the Lanham Act,

40

which "is to prevent consumer confusion or deception about the origin or make of a product." *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477, 484 (9th Cir. 1994). Here, an unintended effect of the district court's ruling is that despite Lodestar owning a federal registration for UNTAMED for rum, by limiting its ability to prove infringement, Lodestar was prevented from enjoining a third party from using a confusingly similar mark on the same product as Lodestar. The effect of this ruling going forward, if endorsed by the Ninth Circuit, would be that an infringer using the same mark on the same goods could potentially continue to do so indefinitely, especially where the trademark owner owns rights based on an intent to use application or a Madrid Protocol-based registration, and has not yet used the mark prior to the infringement. In such a case, two competitors would be permitted, even authorized under this new rule, to use the same mark on the same goods and neither could stop the other. Such a result would encourage and lead to, not prevent, consumer confusion and deception.

If the district court's ruling stands, and a trademark owner going forward cannot rely on use of its mark on any new product after infringement begins to show likelihood of confusion, such a ruling would eviscerate the policy behind certain types of trademark applications where actual use is not required prior to acquiring rights, including applications under the Madrid Protocol and intent to use applications. Lodestar's '239 Registration is based on a foreign registration

pursuant to Section 66(a) of the Lanham Act, 15 U.S.C. § 1141 *et seq.* The Madrid Protocol is highly analogous to an intent to use application in that evidence of trademark use is not required before obtaining a U.S. Registration.  15 U.S.C. § 1141k.  Once a U.S. Trademark Registration issues based on a Madrid Protocol-based application, "it is treated much the same as any other registration on the Principal Register." 3 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 19:31.60 (citing *Dragon Bleu*, 112 U.S.P.Q.2d at 1925.

Other courts have soundly rejected the theory that an infringer can gain superior rights and cannot be stopped from infringing simply because the infringement began after the filing of trademark application and before actual use by the trademark holder.  An intent to use trademark application, which is highly analogous to a Madrid Protocol application, "prevails over any opposer who began using a similar mark after the intent-to-use filing date."  *Aktieselskabet AF 21 November 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 18 (D.C. Cir. 2008).  "Holding to the contrary . . . would also vitiate the intent-to-use application system itself. Congress created the intent-to-use application in the 1988 amendments to the Lanham Act with the goal of eliminating the need to use a mark before applying to register it."  *Id.* at 19.  If actual use were required prior to infringement, "an intent-to-use applicant would be vulnerable to pirates and to *anyone initiating use after it files its application.*" *Id.* (emphasis in original).

Moreover, if the trademark owner is estopped from offering of evidence of post-infringement new use to halt the infringement, and the infringer is therefore permitted to continue its infringement indefinitely:

> it would encourage unscrupulous entrepreneurs to look in the record for new ITU [intent to use] applications by large companies, rush in to make a few sales under the same mark and sue the large company, asking for a large settlement to permit the ITU applicant to proceed on its plans for use of the mark. The use of such abusive litigation should not be encouraged. Congress intended by the constructive use system to enable the applicant to prevent later uses from usurping its superior priority rights.

3 McCarthy on Trademarks And Unfair Competition § 19:29 (5th ed.); *Warnervision Entm't v. Empire of Carolina, Inc.*, 101 F.3d 259, 262 (2d Cir. 1996) (the "vulnerability to pirates is precisely what the ITU enactments were designed to eliminate.")

Moreover, in a reverse confusion context such as this case, the much larger company such as Bacardi decided to simply pirate the trademark of a much smaller company despite knowing of Lodestar's preexisting rights, with the apparent expectation that Lodestar would not have the resources to challenge the infringement. The district court's ruling also would encourage larger companies such as Bacardi to continue to pirate trademarks from small entrepreneurial

43

companies, who, despite having superior trademark rights, may not able to make their brands successful before the infringement by the larger companies, and who do not have the resources to take on the larger company in federal court.

The district court's ruling would also severely undermine the legislative purpose of the U.S. entering into the Madrid Protocol in the first place. Congress enacted the Madrid Protocol procedures to streamline the international trademark application process in an effort to improve the competitiveness of American business. The legislative history is instructive, as it states that:

> Since products are marketed and sold on an international scale, protection in countries other than the United States improves the competitiveness of American business. Each country has its own laws determining the level of protection for trademarks and the type of marks that can be registered for particular products. American citizens seeking protection for their trademarks outside the United States are currently required to register separately in each country in which protection is sought. Registering in multiple countries is a time-consuming, complicated and expensive process-- a process which places a disproportionate burden on smaller American companies seeking international trademark protection. In too many cases, these small- and medium-sized businesses are forced to forego effective worldwide protection of their marks and to settle instead for the limited

109632154.6

protection afforded by trademark registration in only a few select countries. Senate Report 106-249, Madrid Protocol Implementation Act, March 27, 2000, 106th Congress (1999-2000).

Thus, Congress, in enacting the Madrid Protocol, intended to make international trademark applications much more efficient for everyone. The legislative history notes that: "Without U.S. participation, the Protocol may never achieve its purpose of providing a one-stop, inexpensive 'shop' for trademark applicants who, by filing one application in their country and in their language, can receive protection from each member country of the Protocol." *Id.*

Congress agreed to the terms of the Madrid Protocol, including the provision that a U.S. registration can be obtained without first proving use (use is required within 5 years) to provide a one-stop, inexpensive shop for trademark applicants. Under the district court's new ruling, this provision will now be meaningless. An owner of a Madrid Protocol U.S. registration who has not yet started use in the U.S. would have "no relevant products for purposes of determining likelihood of confusion" as no such product likely has been sold in the U.S. prior to infringement. The streamlined approach of filing in multiple countries at one time, and then having up to five years to establish use in each country, would be eviscerated. The registration holder would therefore have no ability to stop an infringer who begins infringement prior to use by the trademark holder in the U.S.

45

Again, the district court's ruling incentivizes such infringement—the earlier the better. It encourages trademark pirates to search through Madrid Protocol registrations and begin infringing as soon as possible, quickly selling products with those marks in the U.S. before the trademark owner has used the mark in the U.S., in order to cutoff rights, and demand a large settlement to permit the trademark owner to proceed on its plans for use of the mark. Such an incentive should not be encouraged or sanctioned by this Court.

The district court's ruling would completely change the nature of trademark law. It is not supported by any legal authority, the court improperly weighted evidence, the ruling is inconsistent with existing Ninth Circuit law, and severely undermines the policies and goals underlying the Lanham Act. The district court's ruling is in err and should be reversed.

## C. The District Court Erred In Holding That UNTAMED For Use With Rum Is Conceptually Weak As A Matter of Law.

As to the conceptual strength of the mark, the district court failed to apply the correct legal standard. The test employed most often in the Ninth Circuit to analyze strength of a mark is known as the "imagination" test, and asks whether "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Zobmondo Entm't, LLC v. Falls Media, LLC,* 602 F.3d 1108, 1115 (9th Cir. 2010). In its ruling, the district court does not

apply (or even mention) the imagination test, or apply or mention the less used "competitor's need" test. Instead, the district court appears to apply the "extent of use" test which evaluates the extent to which other sellers have used the mark on similar merchandise. *Zombondo*, 602 F.3d at 1118. This is legal error. The Ninth Circuit has held that application of the "extent of use" test "could not command a summary judgment in the face of disputed facts about how a mark might be perceived by consumers." *Id.* at 1118. Thus, the district court's use of that test as a basis for summary judgment is legal error.

In addition, the district court failed to provide all inferences to the non-moving party and improperly usurped the role of the jury. On summary judgment as to conceptual strength, a district court must take into account the "strong presumption" accorded by Lodestar's federal registration that the mark is inherently distinctive. *Id.* at 1121. "Deference to the PTO's classification decision is sensible because the PTO has special expertise that we lack on this fact-intensive issue." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1199 (9th Cir. 2009) (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 934 (4th Cir.1995)). "[T]he presumption of validity is a strong one, and the burden on the defendant necessary to overcome that presumption at summary judgment is heavy." *Zombondo*, 602 F.3d at 1115; *see also Americana Trading, Inc. v. Russ Berrie & Co.,* 966 F.2d 1284, 1287 (9th Cir.1992) (reversing a district court's grant

of summary judgment because the district court "gave insufficient weight to the presumptive effect of[the plaintiff's] federal registration.").

In addition to the strong presumption that the mark is conceptually strong, Lodestar offered unrebutted expert testimony from Dr. Leonard who opined that the terms UNTAMED and UNTAMEABLE "clearly do not describe or even suggest any aspects of liquor, making the relation between the terms and the products for which they are used, namely rum, arbitrary."  ER 448.  As explained above, Dr. Leonard concluded that "there is close semantic relationship between the terms *untameable* and *untamed*, wherein speakers will understand that an entity that has a lack of ability to ever be *tamed* also means that that entity is currently *untamed*: something UNTAMEABLE must also be UNTAMED."  ER 450-451. Dr. Leonard also performed a broad "collocate" search in a massive database for tame/untamed/untameable and found that these terms appear in one primary semantic category: nature. Dr. Leonard concludes that in the present case, UNTAMED and UNTAMEABLE refer to a manufactured alcohol, such as rum, which does not appear in the preferred semantic category of nature and opines that "the terms UNTAMED and UNTAMEABLE clearly do not describe the product – namely rum." ER 453.

Lodestar also relies on the fact that there are ***no other trademark registrations*** in Intl. Class 33 for UNTAMED other than Lodestar's. ER 146 at

¶ 13; ER 149A.

In response, Bacardi cited to unauthenticated documents and made contradictory claims of both third party trademark use and that untamed describes rum. Bacardi relies on federal applications for labels and internet printouts of purported advertisements. Bacardi presents no admissible evidence that any of these products were actually sold in the United States, and if so, what quantities and when, or that any of the labels were ever used in commerce. *See,* ER 48A-48F.

The documents Bacardi point to largely reference Untamed and nature, people, or physical locations—not rum or alcohol—and largely substantiate Dr. Leonard's conclusions. For example, Lady Bligh rum refers to its product as being "everything you want in a woman . . . spirited and untamed on the inside." ER 255. This does not refer to a characteristic of rum without exercise of the imagination. Kong Rum is referring to nature ("untamed rum, as wild as Nature"), which also requires a mental leap. ER. 274. Ardbeg analogizes to an "untamed spirit of islay" (an island) ER 294. and the "Untamed Islay [Island] Experience", ER 223, again requiring a mental leap for the association. Backcountry Untamed Gin analogizes to the qualities of nature. ER 292. Koko Kanu analogizes to the "simple, untamed beauty of Jamaica." ER 250. Again, untamed is used in connection with describing natural beauty—not alcohol. Downeast analogizes to the "wild, untamed island in maine." ER 283. Needle Pig refers to the

49

"Untamed Backcountry. ER 288.; ER 299 (untamed describes Africa); ER 300, ER 306 (untamed describes oak); ER 320, ER 324, ER 336, ER 342 (tame is used as a verb and does not describe anything). Thus, in almost all instances, "untamed" is not being used to describe rum or alcohol. Again, Bacardi offers no any admissible evidence that any of these products were ever sold in the Unites States.

Further, many of the purported examples are directed to wine, including nearly all of the purported evidence from Bacardi's Exhibit 35. ER 160-161, ER 163, ER 168, ER 171, ER 174, ER 178, ER 182, ER 186, ER 190, ER 194, ER 197; ER 198A-198K; ER 199, ER 203, ER 207, ER 214; ER 296. Bacardi argues that wine is not relevant. Bacardi's own summary judgment brief cited *to Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1035 (N.D. Cal. 2017) for the proposition that "bourbon and wine are 'very distinct products' because '[t]hey have different alcohol contents and social uses, and they occupy different sections of stores where they are offered for sale." ER 679.

None of Bacardi's examples of alleged third party usage would be admissible at trial, or even evidence of actual products sold to in the United States to consumers. Bacardi tries to claim that untamed is "frequently" used by third parties, but its website printouts offer no admissible evidence showing that any of these are actually sold in the U.S. or any amount of actual third party use in the United States. For example, Bacardi fails to show whether any quantities of any

such third party products have actually been sold in the U.S. marketplace or available to consumers in retail locations or bars. Bacardi further points to no consumer surveys or any other evidence that any consumers had any awareness of any of the alleged third party uses. And Bacardi's TTB forms similarly do not indicate whether any of these had ever been actually used in the U.S. marketplace, and if so when or any volume of sales.

The district court, however, in applying the incorrect legal test, accepts Bacardi's purported evidence as third party use, even though Bacardi offered no evidence that any of these products were sold in the United States, or that any of the cited labels were ever used in commerce. ER 21. Moreover, the district court finds such evidence *dispositive* to the issue. The district court fails to give proper deference to the strong presumption that the mark is inherently distinctive. The district court fails to give any weight to Dr. Leonard's unrebutted expert testimony. The district court fails to draw all inferences to Lodestar, and instead weighs the credibility of disputed facts, and makes a factual finding that "Lodestar's UNTAMED word mark is conceptually weak." ER 22.

This is clear legal error. Ninth Circuit law is clear that a district court is not "permitted to weigh evidence or draw inferences against" the non-moving party. *Zobmondo*, 602 F.3d at 1121. In *Zobmondo,* the Ninth Circuit reasoned that in giving the plaintiff the benefit of the presumptive effect of its federal registration,

crediting additional testimony in favor of the plaintiff, placing the burden of challenge to the mark's distinctiveness on the defendant, "and giving all reasonable inferences" to the plaintiff, "we conclude that there is a genuine issue of material fact" as to the strength of the mark which "cannot correctly be resolved by summary judgment, and we remand for trial." *Id.* at 1121.

The result should be the same here. Lodestar's federal registration holds a strong presumption of validity. Lodestar offered unrebutted expert testimony and evidence that no other entity owns a mark for UNTAMED in International Class 33. Even if the Court accepts Bacardi's evidence, at the very least, it creates a triable issue of fact and this issue should be remanded for trial.

In addition, the district court did not consider the fact that Bacardi uses its famous BACARDI house mark in connection with UNTAMEABLE *increases* the likelihood of confusion in the reverse confusion context. In a reverse confusion case, the prominence of a junior user's house mark can aggravate confusion. The *Americana Trading, Inc. v. Russ Berrie & Co.*, case is instructive. 966 F.2d 1284 (9th Cir. 1992). In *Americana Trading*, the Plaintiff owned a registration for "Wedding Bears" for toy stuffed bears. Defendant (junior user) used a hangtag on teddy bears with one side labeled as "Wedding Bears" and the other side with Defendant's house mark. The district court granted summary judgment in favor of Defendant based on no likelihood of confusion. The Ninth Circuit reversed, and

stated in part that "the prominence of Russ's housemark may serve to create reverse confusion [such that consumers believe] that Russ, and not Amtra, is the source of Amtra's 'Wedding Bears.'" *Id.* at 1288. The Ninth Circuit further held that "use by Russ of its housemark along with Amtra's trademark may 'be an aggravation and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor.'" *Id.* (*quoting Menendez v. Holt*, 128 U.S. 514, 521 (1888)); *see also* 4 McCarthy on Trademarks and Unfair Competition § 23:10 ("[T]he junior user's use of a house mark along with the mark in issue, could aggravate, not lessen, the likelihood of reverse confusion."); 4 McCarthy on Trademarks and Unfair Competition § 23:10; *Cherokee Inc. v. Wilson Sporting Goods Co.*, CV 15-04023 BRO (Ex.), 2015 WL 12656935, at *5 (C.D. Cal. Jun 19, 2015) ("the prominence of [the defendant's] housemark may serve to create reverse confusion that [defendant], and not [plaintiff], is the source of [plaintiff's products].")

D. **The District Court Erred In Ruling That UNTAMED and UNTAMEABLE For Rum Are Not Similar In Sight, Sound, and Meaning.**

As to the similarities of the marks, the district court again improperly acts as a trier of fact and weighs evidence, fails to draw all reasonable inferences in favor of Lodestar, refuses to even consider evidence of actual confusion, or Dr. Scott's

109632154.6

survey evidence which yielded a result of *18.6%* net confusion between the UNTAMED and BACARDI UNTAMEABLE marks with respect to rum. ER 433. While the district court states that "[i]t is obvious that the words 'untamed' and 'untameable' are similar because they because they are different forms of the word 'untame,'" the district court finds this factor "weighs against any likelihood of confusion." ER 24, ER 26.

As to sight, sound, and meaning, Lodestar offered the unrebutted expert testimony of Dr. Leonard who opined that the trademarks UNTAMED and UNTAMEABLE "are highly similar in sight and sound, and are almost identical in meaning." ER 445. Dr. Leonard opined as to sight that the greater proportions of UNTAMED and UNTAMEABLE (i.e., *untame*) are identical in letter count and the visual presentation of UNTAMEABLE with an "e" after the "m" makes them especially similar. ER 468-469. Dr. Leonard opined that as to sound, the greater proportion of the marks are identical in phonemic inventory and share the identical stress pattern when they are pronounced. ER 448. As to meaning, UNTAMED and UNTAMEABLE share a common root *tame* and share a close semantic relationship; "something UNTAMEABLE must also be UNTAMED." *Id.*

In addition, Dr. Leonard analyzed how the words were used by consumers, and by Bacardi. Dr. Leonard found numerous examples where consumers used the word UNTAMED to refer to the Bacardi UNTAMEABLE campaign.

ER 453-466.   Dr. Leonard also noted that a Bacardi Senior Brand Manager admitted that "people may try to shorthand" UNTAMED for UNTAMEABLE. ER 453.   Dr. Leonard concluded that in online and social media use, "there is evidence that consumers associate the term UNTAMED with the UNTAMEABLE campaign. This occurs even when BACARDI UNTAMEABLE is visually present in a corresponding image or advertisement."  ER 469.

The district court, while agreeing that untamed and untameable are "indeed similar," stated that they are not identical and do not share the exact meaning. ER 24.  The district court also noted that the examples of actual confusion cited by Dr. Leonard are "unremarkable."  *Id.* at fn. 5.

It is not the district court's job to weigh evidence.  Again, the court fails to draw any inferences in favor of Lodestar.  It is legal error to simply ignore the evidence of similarity of the marks.  This issue should be remanded for trial.

In addition, the trial court reiterates its holding that Lodestar's is estopped from using evidence of its UNTAMED Revolutionary Rum to show likelihood of confusion because this use occurred after the infringement began, which is legal error as explained above.  The district court also relies on Bacardi's survey expert Ms. Butler showing 6% net confusion (which is close to legally recognizable net confusion), but it fails to consider or address the various flaws in that survey, as explained by Dr. Scott, including that Ms. Butler showed the respondents an image

of a product where the word UNTAMED appeared only at the bottom of the back label of the bottle of rum, the word UNTAMED was "overlaid by black shading that makes it difficult to read the entire word" and she did not show the survey respondents the prominent print ad used mainly by Bacardi and instead showed the survey respondents a 60 second commercial where the BACARDI UNTAMEABLE mark was shown for approximately 3 seconds, which, when corrected, showed net confusion at a legally significant level. ER 427-429.

In addition, the district court makes additional factual conclusions as to what a "reasonably prudent consumer" would do without any proper basis. ER 25.

This is yet another example of the district court improperly giving weight to disputed material facts and failing to draw all reasonable inferences in favor of Lodestar which is legal error.

## E. The District Court Erred In Ruling That the Intent Factor Is Neutral

Intent can be proven in a reverse confusion case "by evidence that, for example, the defendant knew of the mark." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017). The district court acknowledges undisputed evidence "that Bacardi knew Lodestar had registered the UNTAMED word mark for use on rum and other distilled spirits at least ten months before launching the

UNTAMEABLE campaign." ER 27. As all reasonable inferences should be drawn for the non-moving party, this factor should weigh in favor of Lodestar.

Incredibly, the district court concludes that this factor is ***neutral*** because of the district court's improper factual finding that UNTAMED "was used at most as a tagline" and that UNTAMED "was not used in U.S. commerce at the time of this [trademark clearance] search." *Id.*

This factor, based on undisputed facts, should weigh heavily in favor of Lodestar. A federal registration is "constructive notice of a claim of ownership so as to eliminate any defense of good faith adoption and use made after the date of registration." McCarthy at § 19:9; 15 U.S.C. § 1072.

In addition, there is substantial evidence that UNTAMED was in use for whiskey and rum in the U.S. at the time of Bacardi's trademark clearance search. A single sale or shipment may be sufficient to show use of a mark. *Dep't of Parks and Recreation for the State of Cal.* 448 F.3d at 1126. This undisputed evidence should weigh heavily in favor of Lodestar, and at the very least, creates a triable issue of fact.

## F. The District Court Erred In Ruling That Lodestar Is Not Legally Entitled To Damages

As to damages, the district court held that "failure to provide any evidence of a prior license or negotiations with a third party to license the UNTAMED word

mark" precluded any claim for damages. This is legal error. It was undisputed that Lodestar's entire business model is to independently create and develop innovative and unique brands of premium products in areas of growth which can be monetized by selling or licensing to a larger entity, who will purchase such innovation instead of creating it internally. This was undisputed.

Damages in reverse confusion cases serve a useful purpose to deter "profit-seeking businessperson[s] not unwilling to violate federal law" from continuing to steal smaller companies' trademarks. *Sands, Taylor & Wood Co. v. Quaker Oats*, No. 84 C 8075, 1995 WL 221871, *2 (N.D. Ill. Apr. 12, 1995). "Courts have allowed reasonable royalties as measure of damages" in trademark infringement cases. *Quia Corp. v. Mattel, Inc.*, No. 10-1902 JF HRL, 2011 WL 2749576, at *6 (N.D. Cal. July 14, 2011). This includes cases alleging reverse confusion. *See Sands, Taylor, & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1350 (7th Cir. 1994) (seminal case holding that reasonable royalty based on hypothetical negotiation is proper remedy in reverse confusion case); *Adidas Am., Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 4279812 at *12 (D. Ore. Sept. 12, 2008) (upholding jury's reasonable royalty award of $30.6 million in trademark infringement case); *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202, 1213-1214 (S.D. Cal. 2016) (reasonable royalty appropriate damages theory in reverse confusion case).

At a minimum, the jury should decide the amount of Lodestar's damages based on a reasonable royalty. "[C]ourts have awarded or approved of 'reasonable royalty' damages <u>if the evidence provides a sufficiently reliable basis from which to calculate them</u>." *QS Wholesale, Inc. v. World Mktg., Inc.*, No. 12-CV-0451 (RNBx), 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013) (emphasis added) (citations omitted). For example, in *Adidas*, the court upheld a jury's reasonable royalties award of $30.6 million to Adidas despite that: (1) "[t]here was no evidence of monetary loss to Adidas in the nature of lost sales"; (2) there were no previous license agreements between Adidas and Payless; and (3) Adidas even conceded "that it would <u>not</u> have licensed the marks to Payless." *Adidas*, 2008 WL 4279812 at *12. The *Adidas* court went so far as to find that "[a]lthough the jury's royalty award would have resulted in a loss to Payless at the current price point, this does not make the royalty unreasonable. There is no rule that a royalty be no higher than the infringer's net profit margin." *Id.*

In *QS Wholesale*, the court found that reasonable royalties were not precluded on summary judgment even where "there is no prior licensing agreement between the parties, and there is no history of WMI <u>ever</u> licensing the VISITOR mark to any third parties." *QS Wholesale*, 2013 WL 1953719 at *5. The *QS Wholesale* court found that even business negotiations regarding a possible

purchase of the mark was sufficient to defeat summary judgment on the issue of reasonable royalties. *Id.*

Here, the undisputed evidence was that Lodestar's entire business model was premised on attempting to license or sell the marks to a larger company. Moreover, Lodestar had entered into an exclusive license agreement with Avalon regarding the UNTAMED mark. These facts alone are sufficient to allow a jury to decide this issue.

Lodestar also relies on Dr. Luna's reasonable royalty analysis which provides a sufficiently reliable damages calculation. As explained above, Dr. Luna examined the *Georgia Pacific* factors under a hypothetical negotiation between Lodestar as a willing licensor and Bacardi as a willing licensee at a time before the infringement began, and found that a reasonable royalty rate would have been 2% of Bacardi's net sales. Sidney Blum opines that it is common for larger international alcohol companies, such as Diageo and Bacardi, to obtain rights to smaller alcohol companies or brands, which may be structured as an outright purchase, a partial purchase, or payment of a royalty.

Indeed, Bacardi itself has a history of acquiring smaller alcohol brands. As such, a reasonable royalty in this case would not be speculative as a matter of law. Lodestar has shown that it is a willing licensor, and, although not necessary for Lodestar to recover royalties, Bacardi has shown it is willing to obtain rights to

60

smaller alcohol trademarks. Lodestar has thus shown a legitimate proposed basis on which to calculate a royalty and the issue of damages should be decided by a jury.

Finally, as to corrective advertising damages, the district court erred in holding that Lodestar offered no evidence of actual confusion, when such evidence including survey evidence was offered to the Court. The district court also erred in holding that Lodestar failed to show goodwill. Mr. Levy testified that at least $5 million has been invested into the creation, development, and promotion of the UNTAMED marks and products for the benefit of Lodestar. ER 52 at ¶ 15.

The district court is required to draw all reasonable inferences in favor of Lodestar, and in doing so, should have found disputed material facts and held a trial to determine damages.

## VI.   REQUEST FOR REASSIGNMENT ON REMAND

To the extent the case is remanded, Lodestar requests reassignment pursuant to 28 U.S.C. § 2106. Under Section 2106, reassignment on remand is appropriate "if there is a demonstration of personal bias or unusual circumstances." *Rhoades v. Avon Prods. Inc.*, 504, F.3d 1151, 1165 (9th Cir. 2007).

In *Rhoades*, the Ninth Circuit ordered reassignment, holding that the assigned district judge "cannot reasonably be expected upon remand to disregard his previously expressed views in this matter" where the judge reasoned the

61

lawsuit was brought for an "improper motive" and the judge's subsequent ruling was legally erroneous. *Id*. at 1165-66.

In this case, the district court similarly and unfairly imputed an "improper motive" on Mr. Levy and Lodestar as a result of Mr. Levy's innocent comment to a colleague in a private email, that the UNTAMED Revolutionary Rum was intended to "complement" the other products for sale and to "combat Bacardi's attempts to take over our Untamed mark by tacking their name in front." ER 371. The district court accepted Bacardi's claim that based solely on this one comment in one email, Lodestar's new label "was clearly a bad faith effort to manufacture a basis for litigation" and on this basis the district court ***excluded*** all evidence of likelihood of confusion based on Lodestar's sales of its UNTAMED Revolutionary Rum product. ER 19.

As explained above, trademark owners have a duty to enforce their rights, which includes building the commercial strength of their marks through use, or they risk losing their trademark rights. The district court's assignment of improper motive based on a party enforcing its trademark rights is not warranted. The facts here are comparable to *Rhoades*, where the district court incorrectly assigned an "improper motive" to the plaintiff and committed legal error. *Rhoades*, 504 F.3d at 1165-66. It is therefore proper to reassign this matter on remand.

## VII. <u>CONCLUSION</u>

The district court's entire ruling on summary judgment and damages should be vacated and remanded.

Dated:  November 4, 2019          Respectfully submitted,

                                      LEWIS ROCA ROTHGERBER
                                      CHRISTIE LLP

By   s/G. Warren Bleeker        

                                      *Attorneys for Appellant/Plaintiff*
                                      LODESTAR ANSTALT

109632154.6

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 19-55864

The undersigned attorney or self-represented party states the following:

⦿ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the
case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The
case number and name of each related case and its relationship to this case are:

**Signature** | s/G. Warren Bleeker    **Date** | Nov 4, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 19-55864

I am the attorney or self-represented party.

**This brief contains** | 13,441 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

  ○ it is a joint brief submitted by separately represented parties;

  ○ a party or parties are filing a single brief in response to multiple briefs; or

  ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/G. Warren Bleeker | **Date** | Nov 4, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 4, 2019

LEWIS ROCA ROTHGERBER
CHRISTIE LLP

By  s/G. Warren Bleeker
     G. Warren Bleeker

*Attorneys for Appellant/Plaintiff*
LODESTAR ANSTALT

109632154.6