**No. 19-55864**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

LODESTAR ANSTALT,

*Plaintiff-Appellant*,

v.

BACARDI & COMPANY LIMITED,
BACARDI U.S.A., INC.,
AND BACARDI LIMITED,

*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
CASE NO. 2:16-cv-06411-CAS-FFM

---

---

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 5
## (REDACTED)

---

Gary J. Nelson, CA Bar No. 184651
G. Warren Bleeker, CA Bar No. 210834
Drew Wilson, CA Bar No. 283616
LEWIS ROCA ROTHGERBER
CHRISTIE LLP
655 N. Central Avenue, Suite 2300
Glendale, CA 91203-1445
Tel. (626) 795-9900
gnelson@lrrc.com
wbleeker@lrrc.com
dwilson@lrrc.com

*Attorneys for Appellant*
LODESTAR ANSTALT

## **TABLE OF CONTENTS TO EXCERPTS OF RECORD**

| Tab | Document | Date | Dkt. | Vol. | Pages |
|---|---|---|---|---|---|
| 1 | Judgment Granting Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 07/23/19 | 330 | 1 | 1–2 |
| 2 | Minute Order Denying Lodestar's Motion for Partial Summary Judgment and Granting Defendants' Motion for Summary Judgment | 07/03/19 | 323 | 1 | 3–35 |
| 3 | Notice of Appeal | 07/26/19 | 331 | 2 | 36-37 |
| 4 | Declaration of Andre J. Levy in Support of Plaintiff Lodestar Anstalt's Reply in Support of Its Motion for Partial Summary Judgment | 06/03/19 | 312-5 | 2 | 38-40 |
| 5 | Exhibit L to Declaration of Andre J. Levy in Support of Plaintiff Lodestar Anstalt's Reply in Support of Its Motion for Partial Summary Judgment | 06/03/19 | 312-6 | 2 | 41-45 |
| 6 | Plaintiff Lodestar Anstalt's Response to Defendants' Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment (Redacted) | 06/03/19 | 311-1 | 2 | 46-48 |
| 7 | Plaintiff Lodestar Anstalt's Evidentiary Objections to Evidence Submitted with Defendants' Motion for Summary Judgment | 05/24/19 | 301 | 2 | 48A-48F |
| 8 | Declaration of Andre J. Levy in Support of Plaintiff Lodestar Anstalt's Opposition to Defendants' Motion for Summary Judgment | 05/24/19 | 300-2 | 2 | 49-53 |
| 9 | Exhibits E-K to Declaration of Andre Levy in Support of Plaintiff Lodestar Anstalt's Opposition to Defendants' Motion for Summary Judgment | 05/24/19 | 300-3 | 2 | 54-111 |
| 10 | Exhibit A to Declaration of Sidney P. Blum in Support of Plaintiff Lodestar Anstalt's Opposition to Defendants' Motion for Summary Judgment | 05/24/19 | 300-5 | 2 | 112-143 |
| 11 | Declaration of G. Warren Bleeker in Support of Plaintiff Lodestar Anstalt's Opposition to Defendants' Motion for Summary Judgment | 05/24/19 | 300-8 | 2 | 144-146 |
| 12 | Exhibit D to Declaration of G. Warren Bleeker in Support of Plaintiff Lodestar Anstalt's Opposition to Defendants' Motion for Summary Judgment | 05/24/19 | 300-9 | 2 | 147-149A |
| 13 | Declaration of Michael C. Lynch, Esq. in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/14/19 | 289-2 | 2 | 150-159 |

1

109656147.1

| 14 | Exhibit 35, Part 1 to Declaration of Michael C. Lynch, Esq. in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/14/19 | 289-37 | 2 | 160-183 |
| 15 | Exhibit 35, Part 2 to Declaration of Michael C. Lynch, Esq. in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/14/19 | 289-38 | 2 | 184-198 |
| 16 | Exhibit 35, Part 4 to Declaration of Michael C. Lynch, Esq. in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/14/19 | 289-39 | 2 | 198A-198K |
| 17 | Exhibit 35, Part 4 to Declaration of Michael C. Lynch, Esq. in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/14/19 | 289-40 | 2 | 199-221 |
| 18 | Exhibit 35, Part 5 to Declaration of Michael C. Lynch, Esq. in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/14/19 | 289-41 | 2 | 222-241 |
| 19 | Exhibit 36 to Declaration of Michael C. Lynch, Esq. in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/14/19 | 289-42 | 3 | 242-348 |
| 20 | Ex. 42 to Declaration of Michael C. Lynch, Esq. in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/14/19 | 289-48 | 3 | 349-350 |
| 21 | Exhibit 1 to Declaration of Michael C. Lynch, Esq. in Support of Application to File Documents Under Seal (Redacted) | 05/13/19 | 288-3 | 3 | 351-358 |
| 22 | Exhibit 6 to Declaration of Michael C. Lynch, Esq. in Support of Application to File Documents Under Seal (Redacted) | 05/13/19 | 288-6 | 3 | 359-370 |
| 23 | Exhibit 15 to Declaration of Michael C. Lynch, Esq. in Support of Application to File Documents Under Seal (Redacted) | 05/13/19 | 288-11 | 3 | 371 |
| 24 | Exhibit 24 to Declaration of Michael C. Lynch, Esq. in Support of Application to File Documents Under Seal (Redacted) | 05/13/19 | 288-16 | 3 | 372-373 |
| 25 | Exhibit 27 to Declaration of Michael C. Lynch, Esq. in Support of Application to File Documents Under Seal (Redacted) | 05/13/19 | 288-17 | 3 | 374-376 |
| 26 | Declaration of G. Warren Bleeker in Support of Plaintiff Lodestar Anstalt's Motion for Partial Summary Judgment | 05/13/19 | 283 | 3 | 377-379 |
| 27 | Exhibit C to Declaration of G. Warren Bleeker in Support of Plaintiff Lodestar Anstalt's Motion for Partial Summary Judgment | 05/13/19 | 283-3-4 | 3 | 380-403 |

| 28 | Exhibit F to Declaration of G. Warren Bleeker in Support of Plaintiff Lodestar Anstalt's Motion for Partial Summary Judgment | 05/13/19 | 283-7 | 3 | 404 |
|----|----|----|----|----|----|
| 29 | Declaration of Andre J. Levy in Support of Plaintiff Lodestar Anstalt's Motion for Partial Summary Judgment | 05/13/19 | 282 | 3 | 405-411 |
| 30 | Exhibit A to Declaration of Andre J. Levy in Support of Plaintiff Lodestar Anstalt's Motion for Partial Summary Judgment | 05/13/19 | 282-1 | 3 | 412-415 |
| 31 | Exhibit D to Declaration of Andre J. Levy in Support of Plaintiff Lodestar Anstalt's Motion for Partial Summary Judgment | 05/13/19 | 282-7 | 3 | 416-419 |
| 32 | Declaration of Dr. Carol Scott in Support of Plaintiff Lodestar Anstalt's Notice and Motion for Partial Summary Judgment | 05/13/19 | 281-3 | 3 | 420-435 |
| 33 | Declaration of Dr. Robert Leonard in Support of Plaintiff Lodestar Anstalt's Notice and Motion for Partial Summary Judgment | 05/13/19 | 281-4 | 3 | 436-470 |
| 34 | Declaration of Edward McPheeters in Support of Plaintiff Lodestar Anstalt's Notice and Motion for Partial Summary Judgment | 05/13/19 | 281-5 | 3 | 471-479 |
| 35 | Declaration of Kris Patton in Support of Plaintiff Lodestar Anstalt's Notice and Motion for Partial Summary Judgment | 05/13/19 | 281-6 | 3 | 480-520 |
| 36 | Exhibit 1 to Declaration of G. Warren Bleeker in Support of Plaintiff's Motion to Compel Discovery | 02/27/18 | 100-1 | 3 | 521-523 |
| 37 | Plaintiff and Counterclaim-Defendant Lodestar Anstalt's Answer to Defendant and Counterclaimant Bacardi Limited's Counterclaims | 09/20/17 | 90 | 3 | 524-529 |
| 38 | Plaintiff and Counterclaim-Defendant Lodestar Anstalt's Answer to Defendants and Counterclaimants Bacardi & Company Limited's and Bacardi U.S.A., Inc.'s Counterclaims | 09/12/17 | 89 | 4 | 530-533 |
| 39 | Bacardi Limited's Answer and Counterclaims | 08/30/17 | 88 | 4 | 534-551 |
| 40 | Defendant Bacardi & Company Limited and Bacardi U.S.A., Inc.'s Answer and Counterclaims | 06/27/17 | 60 | 4 | 552-565 |
| 41 | Complaint for: 1. Federal Trademark Infringement; 2. Federal Unfair Competition; 3. Cal. Bus. Code § 17200; 4. California Common Law Unfair Competition | 08/25/16 | 1 | 4 | 566-590 |
| 42 | Central District of California Docket, Case No. 2:16-cv-06411-CAS-FFM | | | 4 | 591-638 |

3

**FILED UNDER SEAL**

| Tab | Document | Date | Dkt. | Vol. | Pages |
|-----|----------|------|------|------|-------|
| 43 | Exhibit A to Declaration of Barbara C. Luna in Support of Plaintiff Lodestar Anstalt's Response to Defendants' Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment - Expert Report of Dr. Barbara C. Luna | 06/03/19 | 311-2 | 5 | 639-664 |
| 44 | Exhibit A to Declaration of G. Warren Bleeker in Support of Plaintiff Lodestar Anstalt's Motion for Partial Summary Judgment | 05/17/19 | 294-2 | 5 | 665-677 |
| 45 | Memorandum of Points and Authorities in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 | 05/13/19 | 288-1 | 5 | 678-679 |

109656147.1

43

43

Case: 19-55864, 12/20/2019, ID: 11540147, DktEntry: 23, Page 7 of 49

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LODESTAR ANSTALT, a Lichtenstein Company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BACARDI & COMPANY LIMITED, a Lichtenstein Company, BACARDI U.S.A., Inc., a Delaware Company and BACARDI LIMITED, a Bermuda Company, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 2:16-cv-6411

<u>EXPERT REPORT OF DR. BARBARA C. LUNA</u>

January 11, 2019

## *FILED UNDER SEAL PURSUANT TO ORDER*
## *OF THE COURT DATED MAY 29, 2019*

ER 639

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# TABLE OF CONTENTS

I.  Overview of Assignment _____ 1

II.  Summary of Opinions _____ 1

III.  Qualifications and Experience _____ 1

IV.  Documents Relied Upon _____ 2

V.  Background _____ 3

   A.  Lodestar Anstalt _____ 3

   B.  Bacardi _____ 3

VI.  Lodestar UNTAMED Marks and Bacardi UNTAMEABLE _____ 4

A.  Lodestar's UNTAMED Marks _____ 4

   B.  Bacardi UNTAMEABLE _____ 10

   C.  Bacardi's motivation in developing the Untameable campaign and intended breadth of the campaign_ 10

VII.  Bacardi's Rum Products Sold in the U.S. Under the UNTAMEABLE Campaign _____ 12

VIII.  Reasonable Royalty Analysis _____ 13

   A.  Relevant Georgia-Pacific Factors _____ 14

   B.  Lodestar License Agreement _____ 16

   C.  Royalty Rate Trends for International Class 33 _____ 17

   D.  Royalty Rates from Comparable Trademarks _____ 17

   E.  Bacardi's History of Acquiring or Obtaining Licenses to Liquor Brands_____ 18

   F.  Conclusion of Reasonable Royalty Rate_____ 18

   G.  Reasonable Royalty Damages _____ 19

IX.  Corrective Advertising _____ 20

   A.  Comparison of Lodestar's UNTAMED and Bacardi's UNTAMEABLE Marketing Campaigns _____ 21

   B  Bacardi's UNTAMEABLE Advertising and Promotion Costs _____ 21

   C.  Lodestar's UNTAMED Advertising and Promotion Costs_____ 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## I.    OVERVIEW OF ASSIGNMENT

1.    I have been engaged by Lewis Roca Rothgerber Christie LLP, attorneys for Lodestar Anstalt ("Plaintiff" or "Lodestar"), to provide expert analysis and testimony, if necessary, in the matter of *Lodestar Anstalt v. Bacardi & Company Limited, Bacardi U.S.A., Inc. and Bacardi Limited* (collectively "Defendants"). Specifically, I have been asked to evaluate Plaintiff's damages arising from Defendants' infringement of Plaintiff's trademarks for UNTAMED.[1]  In conducting my analysis, I have been asked to assume that Lodestar prevails on its liability claim against Defendants.

2.    I reserve the right to update and revise my opinions and conclusions, for example, should additional data or information become available to me.

## II.    SUMMARY OF OPINIONS

3.    The following is a summary of my overall conclusions of damages.  This summary is presented for the convenience of the reader and does not reflect my conclusions in their entirety, which are reflected in the body of this report.

|  | Amount | Prejudgment Interest | Total |
|---|---|---|---|
| *Scenario I* | | | |
| Reasonable Royalties | $25,498,257 | $1,595,172 | $27,093,429 |
| | | | |
| *Scenario II* | | | |
| Corrective Advertising Based on ▮ of | | | |
| Bacardi's Marketing and Advertising Costs | $46,860,563 | $0 | $46,860,563 |

4.    I have not attempted to allocate damages among the Defendants, as I understand that Lodestar alleges they are jointly and severally responsible for payment of any damages.  In addition, I understand that the trier of fact may award treble damages.  My analysis is limited to determining compensatory damages, which could be trebled by the trier of fact.

## III.    QUALIFICATIONS AND EXPERIENCE

5.    I am a Senior Partner in the accounting and litigation services firm of White Zuckerman Warsavsky Luna & Hunt, LLP ("White Zuckerman") in charge of the commercial litigation practice.  I analyze financial, accounting, economic, business, real estate and valuation issues relating to liability and damages in litigation

---

[1] Trademark Registration No. 4,033,238 for UNTAMED and design in International Class 33 and Trademark Registration No. 4,033,239 for UNTAMED in International Class 33.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

matters, including intellectual property. I have testified as an expert on my findings in over 500 trials and arbitrations during the past 40 years.

6.      Prior to joining White Zuckerman, I was a Partner with Coopers & Lybrand specializing in litigation and financial advisory services.  Prior thereto, I was the National Director of Litigation Consulting for Kenneth Leventhal & Company, where I was responsible for directing the litigation services practice nationwide. Previously, I was a Partner with Pannell Kerr Forster, where I was responsible for litigation and reorganization services in Los Angeles and was a Senior Manager with Price Waterhouse specializing in litigation services. Before focusing on litigation services, I was an investment banker specializing in corporate finance.

7.      I obtained my BA degree from Wellesley College in Physics and my MS and PhD degrees from Harvard University in Applied Math.  I have taught graduate and undergraduate courses in working capital management, business finance, forensic accounting and intermediate accounting at UCLA Graduate School of Management, California State University at Northridge and Pepperdine University.  I have also addressed numerous audiences and appeared on several professional panels.

8.      I am a Certified Public Accountant, a Certified Fraud Examiner, Certified in Financial Forensics, a Master Analyst in Financial Forensics, an Accredited Senior Appraiser in Business Valuation, a Certified Valuation Analyst, Accredited in Business Valuation, a Certified General Real Estate Appraiser, a Certified Commercial Real Estate Appraiser, a Certified Residential Real Estate Appraiser, a Certified Management Consultant, and a Diplomate Board Certified Forensic Examiner and Accountant.  I am also a member of the American Institute of Certified Public Accountants (and hold the AICPA's CFF and ABV designations), the California Society of Certified Public Accountants (and the Society's Economic Damages, Fraud and Business Valuation Common Interest Member Services Committees), the Association of Certified Fraud Examiners, the Association of Business Trial Lawyers, the American Society of Appraisers, the National Association of Certified Valuation Analysts, the National Association of Real Estate Appraisers, and the Institute of Management Consultants. My resume, listings of trial and deposition testimony for the past four years and my publications are provided in APPENDIX A.

9.Fees for my firm range from $140 per hour to $495 per hour based on the experience of our professionals.  My fees for providing testimony are $495 per hour.  Our fees are based on our time for our services rendered and are not contingent on the outcome of any matter.

## IV.    DOCUMENTS RELIED UPON

10.      In forming my opinions to date, I, or my staff working at my direction, have reviewed documents and other materials provided through discovery or obtained from public sources.  The documents on which I rely

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

are listed in APPENDIX B, or otherwise cited in this report.  If additional relevant documents or other information become available, I reserve the right to supplement my opinions as appropriate.

## V.     BACKGROUND

### A.     Lodestar Anstalt[2]

11.     Plaintiff Lodestar is a Lichtenstein company.  Lodestar is the owner of United States Trademark Registration No. 4,033,238[3] for "UNTAMED" and design in International Class 33[4] (the "'238 Mark") and United States Trademark No. 4,033,239[5] for the "UNTAMED" mark in International Class 33 (the "'239 Mark").  The '238 Mark and the '239 Mark are collectively referred to as the "UNTAMED marks."  I understand that Lodestar contracts with other companies to develop, market, promote, and sell products in connection with the UNTAMED marks.  All of the marketing, promotion, and advertising efforts performed in connection with the UNTAMED marks are subject to Lodestar's strict quality control standards and are actively monitored by, and approved by Lodestar, and all such efforts are performed to inure for the benefit of Lodestar and its UNTAMED marks.

### B.     Bacardi

12.     Bacardi operates globally and has a presence in 170 countries around the world through numerous subsidiaries, divisions, holding companies and other entities (collectively "Bacardi").  Bacardi has over 200 brands and labels, including Bacardi rum, "the world's best-selling and most-awarded rum",[6] which is the brand marketed under Bacardi's alleged infringing UNTAMEABLE advertising and marketing campaign.

#### a)   Bacardi Limited

13.     Defendant Bacardi Limited is headquartered in Bermuda and is purportedly the "largest privately held spirits company in the world" that produces a variety of premium spirits and wines.[7]  Bacardi Limited is the parent company of Bacardi U.S.A., Inc. and Bacardi and Company Limited, along with numerous other subsidiaries, divisions and holding companies throughout the world.

#### b)   Bacardi U.S.A., Inc.

14.     Defendant Bacardi U.S.A., Inc. ("Bacardi USA") is the Bacardi entity located in the United States that

---

[2] Complaint filed August 25, 2016 and Declaration of Andre Levy in Support of Opposer Lodestar Anstalt's Cross Motion for Partial Summary Judgment and Brief in Opposition to Bacardi & Company Limited's Motion for Summary Judgment.
[3] Per the 238 Mark registration, it has a July 21, 2009 priority date and an October 4, 2011 registration date.
[4] Trademark International Class 33 is for wine and spirits, which includes whiskey and rum.
[5] Per the '239 Mark registration, it has a July 16, 2009 priority date and an October 4, 2011 registration date.
[6] Per www.bacardilimited.com.
[7] Id.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

is responsible for distribution into the U.S.[8]

### c) Bacardi & Company Limited

15.     Defendant Bacardi & Company Limited ("BCL") is a Lichtenstein Company.  BCL is the Bacardi entity that is responsible for Bacardi's trademarks and related information.[9]

## VI.    LODESTAR UNTAMED MARKS AND BACARDI UNTAMEABLE

16.     Lodestar alleges that Bacardi knowingly and willfully infringed its UNTAMED marks on the same and related alcohol products as Lodestar's UNTAMED marks, and seeks recovery based on a legal theory of reverse confusion.  In a reverse trademark confusion case, the junior user [Bacardi] "saturates the market and overwhelms the senior user [Lodestar]. The result is that the senior user loses the value of the trademark, its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed.) (internal quotations and footnotes omitted). "The archetypical case of reverse confusion occurs when the junior user," here Bacardi, "is a larger company which, prior to its nationwide launch, discovers a small (usually regional) senior user with a very similar mark in a related field." Id. (internal quotations and footnotes omitted).   The damages claimed in my report are applicable if either one or both of Lodestar's UNTAMED marks are found to be infringed.

## A.    LODESTAR'S UNTAMED MARKS

17.     Lodestar first received international registrations for its UNTAMED marks in August 2009 and has been using the UNTAMED marks since at least 2009.   In the U.S., the UNTAMED marks have a priority date of registration of July 16, 2009 for the '239 Mark and July 21, 2009 for the '238 Mark.  Both the '238 Mark and the '239 Mark have U.S. registration dates of October 4, 2011.[10]  Lodestar has made use of its UNTAMED marks in International Class 33 on whiskey products in the U.S. since at least 2009 and on rum products since at least 2013.[11]  It is my understanding that Lodestar used either one or both of its UNTAMED marks in all 50 states.  If the court finds that usage of both of the marks were limited geographically and limits corrective advertising damages based on geographic usage of the marks, as some courts have done, I reserve the right to supplement my Lodestar corrective advertising damages analysis.   If at least one of Lodestar's Marks was used in a state, corrective advertising damages would not be limited in that state, if the court finds a geographic limitation is applicable.

---

[8] Deposition of Mauricio Vergara at pages 141-142.
[9] Deposition of Mauricio Vergara at pages 95-96 and 141-142.
[10] Based on U.S. Trademark Registrations for the '238 Mark and the '239 Mark.
[11] Complaint filed August 25, 2016.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Dr. Barbara C. Luna
January 11, 2019                                                    Lodestar Anstalt v. Bacardi & Company Limited, et al

18.     Lodestar's products used in conjunction with the UNTAMED marks in Europe include: Untamed Irish Vodka, The Exiles Irish Gin, The Wild Geese Irish Whiskey Collection, The Wild Geese Rum Collection, Untamed Revolutionary Rum and The Wild Geese Irish Honey Liquor.  In the U.S., Lodestar products using the UNTAMED marks include: The Wild Geese Irish Whiskey Collection, The Wild Geese Rum Collection and Untamed Revolutionary Rum.

19.     Lodestar promotes the UNTAMED marks in the U.S. and throughout the world by advertising and marketing its branded products through various channels including, but not limited to, print media, online advertisements, international beverage competitions and attendance at tradeshows and consumer events. Lodestar has received numerous international awards for its distilled spirits, "Gold" and "Silver" medals at WSWA (Wine and Spirits Wholesaler's Association of America) in 2013 for the premium and golden rums, "Gold" medals for both golden and premium rum by the Beverage Tasting Institute in 2013, "Double Gold" at the Madrid Rum Renaissance in 2013, "World's Best Vodka" for its UNTAMED Irish Vodka from the 2016 World Vodka Awards, "Best Gold Rum" for The Wild Geese Golden Rum from the 2015 World Rum Awards, "Gold" for The Wild Geese Golden Rum from the 2015 San Francisco World Spirits Competition, and "Best Contemporary Gin" for The Exiles Irish Gin from the 2016 World Gin Awards.

20.     In the fall of 2012, Lodestar exhibited its branded products, including rum, using the UNTAMED marks at the Bar Convent Berlin, a large annual industry beverage tradeshow in Berlin.  Lodestar's focus was the promotion of The Wild Geese Rum Collection,[12] which was prominently displayed in Lodestar's booth at the tradeshow along with the theme and backstory of the Irish Diaspora as shown in the Figure below.  Lodestar alleges representatives from Bacardi who were also in attendance visited Lodestar's booth.  Subsequently in 2013, Lodestar learned of Bacardi's UNTAMEABLE marketing campaign.[13]

---

[12] The Wild Geese Rum Collection includes Golden Rum, Premium Rum and Caribbean Spiced Rum.
[13] Declaration of Andre Levy in Support of Opposer Lodestar Anstalt's Cross Motion for Partial Summary Judgment and Brief in Opposition to Bacardi & Company Limited's Motion for Summary Judgment.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



*Figure 1 – UNTAMED The Wild Geese Rum at the Berlin Tradeshow*



21.    As a small independent developer and distributor, Lodestar is far more limited in its ability to incur massive marketing costs to promote its UNTAMED marks and brands, whereas Bacardi, the self-described largest privately-held spirits company in the world, has a massive annual marketing budget.  However, Lodestar has continued to market, advertise and promote its UNTAMED marks.  The Figure below summarizes Lodestar's costs incurred for professional, marketing and design services for the UNTAMED marks.  Lodestar spent approximately $5.54 million in advertising and marketing the UNTAMED marks.  Should additional expenses be provided, I will update this report accordingly.

*Figure 2 –Amounts Expended for Professional, Marketing, and Design Services for the UNTAMED Marks[14]*

| | Fiscal years Ended January 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
| Marketing and Design Services | $357,048 | $1,071,620 | $1,534,955 | $603,178 | $139,005 | $1,221,882 | $553,803 | $53,548 | $5,535,039 |

22.    Figure 3 below summarizes Lodestar's distribution of samples and sales of spirits in the U.S. by type utilizing the UNTAMED marks.

[14] See Exhibit 1 Schedule 7.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Dr. Barbara C. Luna
January 11, 2019

Lodestar Anstalt v. Bacardi & Company Limited, et al

*Figure 3 – Lodestar's U.S. Distribution in Bottles by Product[15]*

| Row Labels | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ⊟ Whiskey | 4,896 | 2,124 | 3,189 | 2,503 | 3,404 | 2,589 | 1,398 | 1,079 | 497 | 126 | 21,805 |
| Classic | | 6 | 1,313 | 895 | 759 | 1,008 | 612 | 534 | 312 | | 5,439 |
| Classic Blend | 2,004 | 1,074 | | 234 | | | | 1 | 75 | 108 | 3,496 |
| Limited Edition | 858 | 216 | 599 | 309 | 520 | 300 | 192 | 216 | 13 | | 3,223 |
| Miniatures | | 12 | 238 | 159 | 138 | 30 | 30 | 24 | 12 | | 643 |
| Rare | | | 62 | 38 | 8 | 9 | 6 | | | | 123 |
| Rare Irish | 1,254 | 570 | 516 | 526 | 1,662 | 1,068 | 462 | 146 | | | 6,204 |
| Single Malt | 780 | 246 | 461 | 342 | 317 | 174 | 96 | 158 | 85 | 18 | 2,677 |
| ⊟ Rum | | | | | 8 | 1,735 | 18 | 4 | | 6 | 1,771 |
| Golden | | | | | 4 | 578 | 6 | | | | 588 |
| Premium | | | | | 4 | 578 | 6 | | | | 588 |
| Revolutionary | | | | | | 579 | 6 | 4 | | 6 | 595 |
| ⊟ Vodka | | | | | | | | 3 | | | 3 |
| Irish Vodka | | | | | | | | 3 | | | 3 |
| Grand Total | 4,896 | 2,124 | 3,189 | 2,503 | 3,412 | 4,324 | 1,416 | 1,086 | 497 | 132 | 23,579 |

23.    The Figures below illustrate Lodestar's use of the UNTAMED marks in advertising and marketing for its various branded spirits including The Wild Geese Whiskey, Untamed Revolutionary Rum, The Wild Geese Soldiers & Heroes Rum and Untamed Irish Vodka.

*Figure 4 – Lodestar Using the UNTAMED marks and The Wild Geese Story*



---

[15] See Exhibit 1 Schedule 8.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Dr. Barbara C. Luna
January 11, 2019

Lodestar Anstalt v. Bacardi & Company Limited, et al

*Figure 5 – Lodestar's UNTAMED marks for The Wild Geese Irish Whiskey Collection*



*Figure 6 - Lodestar's UNTAMED marks for Untamed Revolutionary Rum*



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Dr. Barbara C. Luna
January 11, 2019

Lodestar Anstalt v. Bacardi & Company Limited, et al

*Figure 7 - Lodestar's UNTAMED marks for The Wild Geese Soldiers & Heroes Rum Collection*



*Figure 8 – Lodestar's UNTAMED Marks for Untamed Irish Vodka*



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

B.    Bacardi UNTAMEABLE

24.    Bacardi & Company Limited filed a trademark application for BACARDI UNTAMEABLE on July 17, 2013 for International Class 33 with a claimed priority date of February 20, 2013.[16] Like Lodestar's UNTAMED theme of the defiance and exile of the Irish Diaspora following the Treaty of Limerick 1691, the Bacardi UNTAMEABLE campaign tells a strikingly similar story of overcoming hardships including prohibition and exile from Cuba following the revolution.  Bacardi's UNTAMEABLE campaign was introduced in the United States in late 2013.[17]  In late 2012, Bacardi decided to launch a new advertising campaign focusing on the Bacardi family; this, the Bacardi UNTAMEABLE campaign was developed.[18]

C.    Bacardi's motivation in developing the Untameable campaign and intended breadth of the campaign

25.    The development and rollout of the Bacardi Untameable campaign was designed to correct what Bacardi referred to as a "███████ in its brand, that the Bacardi brand "████████████████████ ████████████████████████████████████████[19] [20]  According to Bacardi's research at the time of the development of the campaign, "████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████."[21] [22] [23] [24]

26.    ████████████████████████████████████████████████████████████ ████████████████████████████.[25]  At the time of the development, Bacardi envisioned the Untameable campaign as a long-term property that would become a 20 or 30 year idea and "stand the test of time."[26] [27] Bacardi believed the Untameable campaign would be comparable to Nike's "Just do it."[28]

---

[16] Complaint filed August 25, 2016.

[17] This is approximately the same time as the Berlin Tradeshow where Bacardi representatives allegedly viewed Lodestar's marketing booth with the UNTAMED marks and theme.

[18] Declaration of Anna Panka in Support of Applicant Bacardi & Company Limited's Motion for Summary Judgment.

[19] Bacardi Brand Idea Induction March 2013 at page BGBL0001030-1039; June 15, 2018 Deposition of Kofi Amoo-Gottfried at page 100-101.

[20] June 15, 2018 Deposition of Kofi Amoo-Gottfried at page 100-101.

[21] Bacardi Brand Idea Induction March 2013 at page BGBL0001030-1039.

[22] *Id.* at BGBL0001039, stating ████████████████████████████████

[23] *See* BGBL0003905 at BGBL0003909-3912.

[24] Bacardi Bottle Relaunch – Gareth W Reice, referring to Bacardi as "its discopiss for douchebags."

[25] *See* BGBL0003905 at BGBL0003909-3912, stating ████████████████████████████ ████████████████████████████████████████

[26] Bacardi Brand Idea Induction March 2013 at page BGBL0001040 and BGBL0001118.

[27] June 15, 2018 Deposition of Kofi Amoo-Gottfried at page 221.

[28] June 15, 2018 Deposition of Kofi Amoo-Gottfried at pages 99-100.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Dr. Barbara C. Luna
January 11, 2019                                                    Lodestar Anstalt v. Bacardi & Company Limited, et al

*Figure 9 – Bacardi UNTAMEABLE Advertisement*



*Figure 10 – Bacardi UNTAMEABLE Advertisement with Rum*



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Dr. Barbara C. Luna
January 11, 2019

Lodestar Anstalt v. Bacardi & Company Limited, et al

*Figure 11 – Bacardi UNTAMEABLE Advertisement*



VII.    BACARDI'S RUM PRODUCTS SOLD IN THE U.S. UNDER THE UNTAMEABLE CAMPAIGN

27.    Barcardi USA produced sales and cost of sales information for its rum products sold in the U.S. for fiscal years ended March 31, 2013 through 2017. Bacardi's net rum sales in the U.S. over this time period were approximately ▮▮▮▮▮.[29] However, Bacardi started using its UNTAMEABLE mark in November 2013[30] and allegedly ceased using the UNTAMEABLE mark at some point between March 2017 and December 2017.[31] For conservative purposes, we are using March 31, 2017 for our calculation of damages. However, Bacardi has also stated they ceased using the UNTAMEABLE campaign in November/December 2017. As such, Bacardi has not provided sales and cost of sales information for this this additional time period, which is in the fiscal year ended March 31, 2018.

---

[29] See Exhibit 2 Schedule 2.1.
[30] Per the Declaration of Anna Panka.
[31] Per the deposition of Mauricio Vergara.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

28.    Bacardi has also asserted, in separate instances, that their UNTAMEABLE marks were used in advertising and promotional materials to promote only non-flavored rum[32] and/or to only promote Bacardi Superior rum, Bacardi Golden rum, Bacardi Black rum, Bacardi Maestro De Ron rum and Bacardi 8 rum.[33] However, Lodestar alleges that Bacardi has primarily used the UNTAMEABLE mark in promoting the general BACARDI house mark that encompasses all of Bacardi's rum products and flavors.

29.    We have determined Bacardi's net sales of approximately ▇▇▇▇▇, which covers the November 1, 2013 through March 31, 2017.  See the figure below.  This is the period Bacardi asserts that it utilized the UNTAMEABLE campaign.  It should be noted that previously, Bacardi stated that its UNTAMEABLE campaign ceased being used in November/December 2017.  However, for conservative purposes, we have utilized the end date of March 31, 2017 for our determination of reasonably royalty damages.  If the time period is through December 31, 2017, there would be an additional ▇▇▇▇▇ in net sales.[34]

*Figure 12 – Bacardi U.S. Rum Net Sales and Volume during Bacardi's UNTAMEABLE Campaign[35]*



| | Fiscal Years Ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | Total |
| | *(Amount in Thousands Except Volume)* | | | | |
| Net Sales | | | | | |
| Volume | | | | | |

## VIII.  REASONABLE ROYALTY ANALYSIS

30.    A measure of the Lodestar's damages in this case can be determined by the application of a reasonable royalty rate on Bacardi's net sales in the U.S. that have been realized through Defendants' use of the UNTAMEABLE mark.  As previously discussed, Bacardi's net sales from its utilization of the UNTAMEABLE mark from November 2013 through March 2017 were approximately ▇▇▇▇▇.[36]  To calculate reasonable royalties, the next step is to determine a reasonable royalty rate that compensates Lodestar for Barcardi's usage of the UNTAMED marks.  In determining a reasonable royalty rate, I considered various sources of information, including Lodestar's license agreement for the UNTAMED marks, which are discussed in detail below.  My conclusion of a reasonable royalty rate is ▇▇ of net sales.

---

[32] Defendant Bacardi U.S.A., Inc.'s Supplemental Responses and Objections to Plaintiff Lodestar Anstalt's First Set of Interrogatories No. 8.
[33] Declaration of Anna Panka in Support of Applicant Bacardi & Company Limited's Motion for Summary Judgment.
[34] See Exhibit 1 Schedules 1 and 2.
[35] Exhibit 1 Schedule 2.
[36] See Exhibit 1 Schedule 1.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Dr. Barbara C. Luna
January 11, 2019

Lodestar Anstalt v. Bacardi & Company Limited, et al

A.    Relevant Georgia-Pacific Factors

31.    In determining a reasonable royalty for Bacardi's use of the UNTAMEABLE mark, I considered the relevant Georgia Pacific factors, which are typically considered in a patent infringement matter, and are also utilized in determining damages in trademark infringement cases involving allegations of reverse confusion.[37]

a.   Factor 1 – Royalties received by trademark owner for licensing the mark

Lodestar has a perpetual and exclusive agreement only with Avalon to use the mark and design portfolio.  This agreement would have an increasing effect on the royalty rate.

b.   Factor 3 – Nature and scope of the license-exclusive/non-exclusive

Lodestar has an exclusive worldwide license with Avalon to use the mark.  This exclusive agreement would have an increasing effect on the royalty rate.

c.   Factor 4 – Licensor's policy and marketing program to maintain a monopoly of the mark

Lodestar has not licensed the mark to anyone other than Avalon, which has a perpetual and exclusive agreement to use the mark and design portfolio.  This policy would have an increasing effect on the royalty rate.

d.   Factor 5 – Commercial relationship between licensor and licensee

Lodestar and Bacardi are direct competitors in the sale of alcoholic beverages.  This direct competition would have an increasing effect on the royalty rate.

e.   Factor 7 – Duration of term of license

As explained above, 
.  According to Kofi Amoo-Gottfried, Bacardi's global brands director, Bacardi initially envisioned using the term UNTAMEABLE continuously for 20 years.[38]  It turned out that Bacardi used the term in its advertising campaign for 3½ - 4 years.  The original intended period and scope for the use of the mark would have an increasing effect on the royalty rate.

f.   Factor 8 – Profitability of the mark and commercial success


.  Also, I understand

---

[37] See exhibit 1 Schedule 3.
[38] Deposition of Kofi Amoo-Gottfried page 221.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Expert Report of Dr. Barbara C. Luna
January 11, 2019                                                                 Lodestar Anstalt v. Bacardi & Company Limited, et al

that Bacardi receives substantial tax rebates for its manufacture of rum in Puerto Rico,[39] which may also significantly increase Bacardi's actual profits. ███████████████████ ████████████████████████████████.

g.  Factor 11 – Extent of use by the infringer and evidence determinative of the value of use

Bacardi used the term UNTAMEABLE in connection with all of its Bacardi branded rum products. Bacardi used the term UNTAMEABLE to have customers identify with the term and the story behind the term in order to eventually increase sales and profitability.[40] UNTAMEABLE is confusingly similar to Lodestar's UNTAMED mark. This extensive use would have an increasing effect on the royalty rate. However, Bacardi did not intend to simply use the existing UNTAMED ad campaign but intended to extend the UNTAMED campaign to tell the Bacardi family history. This would have an overall decreasing effect on the royalty rate.

h.  Factor 12 – Portion of profit or selling price customary in the business

White Zuckerman did a reasonable royalty analysis, as shown in Exhibit 1 Schedules 5 and 5.1, using Battersby and Grimes, RoyaltySource and RoyaltyStats and found that typical royalties involving alcoholic beverages ranged from 3% - 9% for the most part, with an average of 5% - 7%. These reasonably consistent royalty rates would have an increasing effect on the royalty rate.

i.  Factor 13 – Portion of profit that should be credited to the mark

Bacardi paid BETC and Camp+King, which are outside advertising agencies, approximately $10 million to develop the UNTAMEABLE mark in their effort to design around the mark.[41] This does not include the cost to advertise the mark, i.e., television, radio and print advertising costs. Ed Shirley of Bacardi had mentioned that he wanted Bacardi ███████████████████ ████████████████.[42] These advertising development payments and acquisition costs would have an increasing effect on the royalty rate.

j.  Factor 14 – Opinion and testimony of qualified experts

I am a qualified expert opining on a reasonable royalty rate for the UNTAMEABLE mark in the alcoholic beverage industry based on the information in this report and considering the profitability of both Lodestar and Bacardi. Considering this information, the impact on the

---

[39] See http://periodismoinvestigativo.com/2017/02/puerto-ricos-unlimited-generosity-towards-rum-companies/
[40] Joint Stipulation Regarding Plaintiff's Motion to Reconsider the Denial to Hear the Discovery Dispute, and Motion to Compel Defendants' Revenue, Profit and Cost information, pages 8 -12.
[41] Defendant Bacardi U.S.A., Inc.'s Supplemental Responses and Objections to Plaintiff Lodestar Anstalt's First Set of Interrogatories No. 8 and Exhibit 1 Schedules 6 and 6.1.
[42] Exhibit 189 to the deposition of Ed Shirley.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

royalty rate would be slightly decreasing to neutral. In my opinion, the relatively low profitability of Lodestar and Bacardi would have the most impact on the decision of the royalty rate.

k. Factor 15 – Amount licensor and licensee would have agreed upon in negotiation

As discussed below, the relatively low profitability of Lodestar and Bacardi would have a slightly decreasing to neutral effect on the royalty rate that would be agreed to in negotiation. It is my opinion that a royalty of █ of gross sales would be the appropriate royalty rate.

l. The following factors were not considered.

   i. Factor 2 – Rates paid by the licensee for other comparable marks

   We were not provided with this information; however, we did consider in Factor 13 the advertising expense to develop the UNTAMEABLE mark paid by Bacardi and the fact that Bacardi acquired smaller alcoholic beverage companies and used the UNTAMEABLE mark for their products. See discussion below and Exhibit 1 Schedule 3.1.

   ii. Factor 6 – Value of mark to licensor as a generator of sales

   We did not consider this factor as relevant in this matter.

   iii. Factor 9 – Utility of the mark over older marks

   Not considered.

   iv. Factor 10 – Nature of the mark

   Not considered.

B. Lodestar License Agreement

32. Lodestar and Avalon Group Management, Inc. ("Avalon") entered into a worldwide, exclusive license agreement on February 1, 2018 with an indefinite term. Lodestar had previously been in a license agreement with Avalon Group, Inc. BVI ("Avalon BVI") and the license agreement with Avalon was for the purpose of formalizing the term with Avalon since Avalon BVI transferred all rights under the previous license agreement with Lodestar to Avalon under a General Deed of Assignment dated January 20, 2016. Avalon and Lodestar had been operating under the terms of the license agreement between Avalon BVI and Lodestar but wanted to formalize the relationship in the current license agreement, which supersedes all previous arrangements between Lodestar, Avalon BVI and Avalon.[43]

---

[43] Master License Agreement between Lodestar Anstalt and Avalon International Management, Inc. dated February 1, 2018.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

33.    The license agreement between Lodestar and Avalon provides Avalon the exclusive worldwide license to a trademark and design portfolio[44] including, but not limited to: The Wild Geese, The Wild Geese Rare Irish Whiskey, The Wild Geese Irish Soldiers & Heroes, Untamed Revolutionary Rum, Untamed, Untamed We Answer to No-One, Unbroken Unbowed Untamed, and others.[45]

34.    The license between Lodestar and Avalon provides for a royalty rate of 10.0% of net revenue for the perpetual and exclusive worldwide license.  Avalon also has the right to sub-license the trademark and design portfolio.[46]

C.    Royalty Rate Trends for International Class 33

35.    In determining a reasonable royalty rate, I also considered licensing royalty rate trends for International Trademark Class 33 (Alcoholic Beverages except Beers).   These licensing royalty rates were for Corporate/Brand Properties and a summary of the annual rates for years 1998 through 2014 shows the licensing royalty rates ranged from 5-10% over this time period.  However, when considering specific alcoholic beverages within International Class 33, the range was lower at 3-6% for each rum, whiskey and spirits distilled, respectively.[47]  For 2015, the ranges for specific spirits were as follows: rum 3-8% (avg. 5.0%), spirits distilled 5-9% (avg. 7.0%), whiskey 3-8% (avg. 5.0%) and wine 3-8% (avg. 5%).[48]

36.    Lodestar is alleging that Bacardi began knowingly and willfully using Lodestar's UNTAMED marks to advertise, market and sell rum specific products in the U.S. under the Bacardi UNTAMEABLE mark in November 2013.  Looking at the licensing royalty rates around this time shows licensing rates in International Class 33 for rum ranged from 3-6% in 2013.  By 2015, this range had slightly increased to 3-8%, with an average of 5%.[49]

D.    Royalty Rates from Comparable Trademarks

37.    In assessing a reasonable royalty rate, I also considered comparable licensing arrangements and compiled a listing[50] for International Class 33.

38.    Additional comparable licensing agreements were obtained from the RoyaltyStat[51] and RoyaltySource[52] databases for International Class 33.  These databases were searched for royalties paid relating to catchphrases and trademarks in International Trademark Class 33.  Our search of the databases identified 22

---

[44] For International Class 33 and International Class 32 (where appropriate).  Other international classes are included that are not alcohol related.
[45] Master License Agreement between Lodestar Anstalt and Avalon International Management, Inc.
[46] *Id.*
[47] Based on *Licensing Royalty Rates* by Gregory J. Battersby and Charles W. Grimes.  2013 Edition.  See Exhibit 1 Schedule 4.1.
[48] Based on *Licensing Royalty Rates* by Gregory J. Battersby and Charles W. Grimes.  2016 Edition.  See Exhibit 1 Schedule 4.
[49] See Exhibit 1 Schedules 4 and 4.1.
[50] See Exhibit 1 Schedules 5 and 5.1.
[51] RoyaltyStat intellectual property database at www.royaltystat.com.
[52] RoyaltySource intellectual property database at www.royaltysource.com.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

licensing agreements that were ultimately selected as comparable to the UNTAMED marks.[53]  Of the 22 license agreements selected, 9 utilized a royalty base of sales.  The remaining 13 license agreements used royalty bases of gross profit, net profit, per case or various other royalty bases.  For the 9 license agreements that utilized a royalty base of sales, the minimum royalty rate was 1.0% and the maximum was 20.0%.  The median and the average were 5.0% and 7.33%, respectively.  The median and the average royalty rates are consistent with the licensing royalty rate trends discussed above.

E.     Bacardi's History of Acquiring or Obtaining Licenses to Liquor Brands

39.    Bacardi has a history of acquiring or obtaining licenses to other liquor brands, including rum and whiskey brands.[54]  Bacardi's acquisitions and licenses include the time period following the launch of the Untameable campaign in 2013.[55]  For example, in 2015, Bacardi acquired Banks rum, which sold approximately 6,000 cases annually at the time of the acquisition.[56]  In 2015, Bacardi obtained a minority stake in independent Scotch whiskey producer Compass Box, stating that "Bacardi has held a long-term belief in supporting innovative founders in emerging and growing businesses."   This shows that Bacardi had a history of acquiring small and large brands and a potential license would not be uncharacteristic.

40.    In addition, Mr. Andre' Levy, Lodestar's trademark advisor and non-executive Chairman, was previously involved in the sale and licensing of the "Route 66" trademarks for use in International Trademark Class 34.  Pursuant to the agreement, the "Route 66" trademark, subject to an existing license agreement, was purchased.  The purchase involved a substantial upfront payment and ongoing royalty payments.  After the purchase, the licensee was granted a new license agreement to use the "Route 66" in International Trademark Class 34 on cigarettes and cigars.  The new terms of the agreement provided the licensee a worldwide exclusive license for the use of "Route 66" with a royalty rate of 5.0% on net sales of cigarettes and 2.0% of net sales on cigars.  This shows Mr. Levy had previously developed a brand of significant value that was purchased by a larger entity, despite very few sales under the mark.

F.     Conclusion of Reasonable Royalty Rate

41.    I determined a reasonable royalty that compensates Lodestar for Bacardi's use of the UNTAMED marks based on a percentage of net sales.[57]  In determining a reasonable royalty rate, I considered the following factors: (1) Lodestar has a current exclusive licensing agreement for the subject UNTAMED marks with a royalty rate of 10.0%; (2) the licensing royalty rate trends for International Trademark Class 33 and, specifically rum

---

[53] See Exhibit 1 Schedule 5.1.
[54] Exhibit 1 See Schedule 3.1.
[55] *Id.*
[56] *Id.*
[57] Net sales are gross sales less excise tax and sales discounts.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

products, had an range of 3-6% around the time period a hypothetical negotiation might have occurred; (3) royalty rates from similar licensing agreements ranged from 1.0% to 20.0% with an average rate of 7.33% and a median rate of 5.0%; (4) any hypothetical negotiation would be for an exclusive U.S. territory, as opposed to worldwide; (5) Bacardi's history of acquiring or obtaining licenses to liquor brands; (6) Bacardi's overall stated gross profit margin on rum products during the Bacardi UNTAMEABLE advertising and marketing campaign, which would be a factor in a hypothetical negotiation considering the impact of a potential royalty on overall profitability; and (7) the expected scope of the use of the mark. Bacardi's reported overall gross profit margin on rum products during Bacardi's UNTAMEABLE campaign was ▮▮▮.[58] Consideration of Bacardi's gross profit margin resulted in the selection of a lower reasonable royalty rate.

42. After consideration of the factors listed above, I selected an overall reasonable royalty rate of ▮▮▮ of net sales.

### G. Reasonable Royalty Damages

43. The calculation of reasonable royalties due Lodestar from Bacardi's infringement of the UNTAMED marks is determined by multiplying Bacardi's net sales of ▮▮▮▮▮▮[59] by the reasonable royalty rate of ▮▮, which results in reasonable royalty damages due Lodestar of $25,498,257,[60] before consideration of prejudgment interest. Pre-judgment interest in the amount of $1,595,172 has been determined from the mid-point of each respective year, or fractional period thereof, through the September 19, 2019 date of trial, based on the annual interest rate on 1 year Treasuries, compounded annually. Total reasonable royalty damages and pre-judgment interest are $27,093,429.[61] See the Figure below. As previously stated, for conservative purposes, reasonable royalty damages are only through March 31, 2107.

---

[58] See Exhibit 1 Schedule 2.
[59] See Exhibit 1 Schedule 1.
[60] Id.
[61] Id.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Figure 13 – Calculation of Reasonable Royalties**



| | Fiscal Years Ended March 31, | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | |
| | | | | | [4] | | | |
| Bacardi Net Sales of Alleged Infringing Products | | | | | | | | |
| Reasonable Royalty Rate | | | | | | | | |
| Reasonable Royalties | | | | | | | | 25,498,257 |
| Prejudgment Interest | | | | | | | | 1,595,172 |
| Total | | | | | | | | $27,093,429 |
| Cumulative Total | | | | | | | | |

44.     As previously mentioned, Bacardi asserts that the UNTAMEABLE mark was not used in connection with its flavored rums in the United States. If it is found by a trier of fact that reasonable royalty damages only apply to Bacardi's non-flavored rum products, reasonable damages can be determined by applying the ▮ reasonable royalty rate to Bacardi's net sales for the non-flavored rum products from the period November 2013 through March 2017, which are $20,430,086. Prejudgment interest through the September 19, 2019 date of trial is $1,277,359, for total reasonable royalty damages and prejudgment interest of $21,707,445.[62]

45.     Bacardi also asserted the UNTAMEABLE mark was used extensively to promote only Bacardi Superior rum, Bacardi Golden rum, Bacardi Black rum, Bacardi Maestro De Ron rum and Bacardi 8 in the United States. If it is found by a trier of fact that reasonable royalty damages only apply to the aforementioned five Bacardi rum products, reasonable damages can be determined by applying the ▮ reasonable royalty rate to Bacardi's net sales for the five products from the period November 2013 through March 2017, which are $19,252,855. Prejudgment interest through the September 19, 2019 date of trial is $1,202,348, for total reasonable royalty damages and prejudgment interest of $20,455,203.[63]

## IX.     CORRECTIVE ADVERTISING

46.     Damages for corrective advertising are for the purpose of counteracting public confusion and misinformation, created in this case by the reverse confusion between Bacardi's UNTAMEABLE mark and Lodestar's UNTAMED marks. Federal courts have generally awarded damages for corrective advertising based

---

[62] Exhibit 1 Schedule 1A.
[63] Exhibit 1 Schedule 1B.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

on the advertising expenditures of the defendant,[64] which can also be used as a proxy for value received by the defendant.

47.     Bacardi Limited describes itself as the largest privately held spirits company in the world with an annual marketing budget far in excess of ███████ per year. As such, Bacardi is afforded the opportunity to promote and market its BACARDI brand through all major media including network and cable/satellite television, the Internet, digital, radio, print publications (national and regional), outdoor advertising on billboards, and through sports sponsorships (i.e., a three-year sponsorship with the National Basketball Association (NBA) to be its exclusive spirits sponsor, the sponsor for the Kentucky Derby and Kentucky Oaks horse race competitions since 2010 and partnering with ESPN and Univision to serve as the first on-air spirits sponsor of the FIFA World Cup in 2014).[65]

A.     Comparison of Lodestar's UNTAMED and Bacardi's UNTAMEABLE Marketing Campaigns

48.     As previously mentioned, Lodestar began using their UNTAMED marks in the U.S. as part of their marketing campaign in 2009 for whiskey products and in 2013 for rum products. At a tradeshow known as the Bar Convent Berlin in Berlin, Germany in the fall of 2012, representatives from Bacardi visited Lodestar's tradeshow booth with their UNTAMED marketing display for Lodestar's rum products. Subsequently, in November 2013,[66] Bacardi launched its UNTAMEABLE marketing campaign.

B     Bacardi's UNTAMEABLE Advertising and Promotion Costs

49.     Since beginning its advertising and promotion campaign in November 2013, Bacardi has used its UNTAMEABLE marks in various advertising venues including, but not limited to: (1) television advertisements on local stations including ABC and NBC, cable stations like FX, TBS, FXX, ESPN, Spike, History Channel, Fox Sports and Comedy Central; (2) print advertisements in magazines including *Esquire, Sports Illustrated, Wired, ESPN Magazine, Rolling Stone, Men's Fitness* and *GQ*; (3) newspapers like an article in the *New York Times* on Bacardi's new UNTAMEABLE advertising campaign; (4) digital on desktop including websites like Bacardi.com, YouTube, Hulu, Facebook, and mobile and social applications like Facebook, Twitter, Instagram, Foursquare and Shazam; (5) OOH (Out of Home) advertising and promotion including wallscapes, transit shelters and taxi stops; and (6) experiential, or engagement, marketing.[67] [68] [69]

---

[64] *Big O Tires Dealers, Inc. v. Goodyear Tire and Rubber Company.* 408 F.Supp. 1219 (D.Colo. 1976) aff'd as modified, 561 F.2d. 1365 (10th Cir. 1977).
[65] Declaration of Anna Panka in Support of Applicant Bacardi & Company Limited's Motion for Summary Judgment.
[66] *Id.*
[67] Declaration of Anna Panka in Support of Applicant Bacardi & Company Limited's Motion for Summary Judgment.
[68] Deposition of Mauricio Vergara.
[69] See BUSA0002949 through BUSA0003042 and BUSA0003180 through BUSA0003198.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

50.    Bacardi initiated its UNTAMEABLE campaign in November 2013, which lasted through at least March 2017, and possibly through December 2017.  Over this time period, Bacardi has incurred at least ▮▮▮▮▮▮[70] dollars in advertising and promotion expenses related to its UNTAMEABLE campaign.  However, Bacardi is alleging that some of these expenses for flavored rum and the development of the UNTAMEABLE campaign should not be considered.  Although Bacardi's UNTAMEABLE campaign started in November 2013, it is our understanding that the amounts paid to BETC London were for the development of Bacardi's UNTAMEABLE campaign and the costs to Camp+King were for digital related costs of the UNTAMEABLE campaign.  See Figure 14 below for a summary of Bacardi's UNTAMEABLE advertising and promotion costs.

*Figure 14 – Bacardi Annual UNTAMEABLE Promotion Costs*



51.    We have determined corrective advertising damages of $46,860,563.[71]  This amount is based on the total amount of Bacardi's UNTAMEABLE advertising and promotion costs incurred, ▮▮▮▮▮, and a ▮▮ allocation based on the premise that this is a reverse confusion issue and dollar-for-dollar spending is not required for corrective advertising.  A ▮▮ allocation of defendant's advertising and promotion expenses for corrective advertising damages has been awarded in several federal court cases, including *Big O Tire Dealers v. Goodyear Tire and Rubber*[72] and *Wes Des Moines State Bank v. Hawkeye Bancorp*.[73]  The amount Bacardi incurred in UNTAMEABLE advertising and promotion expenses can also be an indication of the minimum potential value Bacardi expected to recoup from its UNTAMEABLE marketing campaign, assuming that Bacardi would not incur costs it did not expect to recoup and eventually earn a positive rate of return, or profit.

52.    As previously mentioned, Bacardi has asserted that its UNTAMEABLE campaign did not apply to Bacardi flavored rums.  If a trier of fact determines this to be the case, then the amount of corrective advertising

[70] See Exhibit 1 Schedule 6.1.
[71] See Exhibit 1 Schedule 6.
[72] 408 F.Supp. 1219 (D.Colo. 1976), aff'd as modified, 561 F.2d 1365 (10th Cir. 1977).
[73] 722 F.2d 411 (1983).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

damages would be $42,174,858.[74]  If it is further determined that the costs Bacardi incurred to initially develop its UNTAMEABLE campaign should also not be considered (BETC London and Camp+King), then the amount of corrective advertising damages are $39,609,375.[75]

### C.    Lodestar's UNTAMED Advertising and Promotion Costs

53.    If the court limits damages to the value of the goodwill of Lodestar's UNTAMED marks, one way to value that is by the amount Bacardi paid to develop the UNTAMEABLE mark, which as discussed above, totals at least $10.25 million.  Another way to value the goodwill of Lodestar's UNTAMED marks is to determine the amount spent to develop Lodestar's marks and campaign.  I have received support for advertising, marketing, and development spending of at least $5.54 million.[76]  It is reasonable to use this amount as a value of the goodwill of the UNTAMED marks.  The marketing and development of the UNTAMED marks was designed to be used in the U.S., one of the largest, if not the largest market for alcohol.  Bacardi affixed its famous BACARDI house mark to the UNTAMEABLE mark, which is alleged to be confusingly similar to UNTAMED, which is claimed by both of Lodestar's asserted trademark registrations.  The use of the word UNTAMED in Lodestar's advertising and promotional materials is extensive.  Bacardi spent over ▮▮▮▮▮▮▮ in the U.S. alone, in part so that consumers would associate BACARDI with the confusingly similar UNTAMEABLE, allegedly damaging the goodwill of the entirety of Lodestar's UNTAMED ad campaign.

54.    Additionally, it is my understanding that Lodestar used either one or both of its UNTAMED marks in all 50 states.  It is my further understanding that some courts have limited a licensor's advertising damages based on geography of usage of a mark.  If the court limits Lodestar's advertising damages based on geography of usage and if it is found that either one or both of the marks were not used by Lodestar in some states, I reserve the right to supplement my opinion of Lodestar's corrective advertising damages accordingly.  If at least one of Lodestar's Marks was used in a state, corrective advertising damages would not be limited in that state, if the court finds a geographic limitation is applicable.

*********

---

[74] See Exhibit 1 Schedule 6.
[75] *Id.*
[76] Exhibit 1 Schedule 7.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

55.    My analysis and opinions contained in this report are based upon information available to date and I am prepared to testify on my findings in this report and attached exhibits. If additional relevant information is provided prior to my trial testimony, I will update my report, will provide it to counsel, and will be prepared to testify on those updated findings. I will be prepared to testify on any corresponding reports by Defendants' expert and may update my report should additional relevant information be provided. In testifying at trial, I expect to use various graphics and demonstratives to describe and illustrate my testimony, including enlargements of the documents I have reviewed or relied upon as exhibits to this report and other demonstratives to be prepared in advance of trial.

Signed this 11th day of January 2019, at Sherman Oaks, California.

Dr. Barbara C. Luna

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

44

44

CONFIDENTIAL

```
 1            UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3          Case No. 2:16-cv-06411-CAS (FFM)

 4   - - - - - - - - - - - - - - - - - - - - -x

 5   LODESTAR ANSTALT,

 6   a Lichtenstein company,,

 7                        Plaintiff,

 8

 9          -against-

10

11   BACARDI & COMPANY LIMITED, et al.,

12                   Defendants.

13    - - - - - - - - - - - - - - - - - - - - -x

14

15            *** CONFIDENTIAL ***

16        VIDEOTAPED DEPOSITION OF

17            GIAN PAOLO LEPRONI

18            New York, New York

19        Wednesday, November 14, 2018

20

21

22   Reported by:

23   JEREMY RICHMAN

24   Job No. 3075155

25   Pages 1 - 192
```

Page 1

CONFIDENTIAL

```
 1        Leproni.)

 2        Q.     I'm handing you a document

 3   marked as Exhibit 153.  It's a printout

 4   of a LinkedIn page I downloaded off the

 5   internet.  Please take a moment to review

 6   the document.

 7        A.     Yes, I've reviewed it.

 8        Q.     Do you recognize this?

 9        A.     I do.

10        Q.     What is this document?

11        A.     This document is a page from

12   LinkedIn with, well, my profile.

13        Q.     Did you prepare this document?

14        A.     I did.

15        Q.     Is the experience that's listed

16   in this document accurate?

17               MR. LYNCH:  Do you mean at the

18        time he prepared it?

19        Q.     Yes, at the time you prepared

20   it.

21        A.     Yes.

22        Q.     And is the education listed

23   accurate at the time you prepared it?

24        A.     Yeah, it is.

25        Q.     What is your role at Bacardi?
```

                                    Page 15

CONFIDENTIAL

```
 1        A.     I am general counsel,
 2   intellectual property and marketing.
 3            MR. LYNCH:  Just so we're
 4      clear, when you say Bacardi today
 5      we're going to assume it's Bacardi &
 6      Co., which is the 30(b)(6) witness.
 7            MR. WILSON:  Yes, I will do my
 8      best to make that clear.
 9            MR. LYNCH:  Okay, thanks.
10        Q.     And if you have any questions
11   as to which Bacardi I'm asking about,
12   because I suspect there may be a little
13   overlap with Bacardi U.S.A. and Bacardi &
14   Co., and frankly, Bacardi Global, please
15   feel free to ask.  And if the answer is
16   relevant to one Bacardi versus the other,
17   please feel free to clarify.
18        A.     I'm the general counsel of IP
19   and marketing at Bacardi Limited.
20        Q.     What is involved in your role
21   as general counsel of IP and marketing
22   for Bacardi & Company Limited?
23        A.     Well, I supervise a team of IP
24   lawyers that assure the registration and
25   protection of the trademarks of Bacardi.
```

Page 16

```
 1    reasons, due to acquisitions in the past.

 2    So certain subsidiary with the production

 3    unit and their trademarks have been kept

 4    as a business that has access to products

 5    and trademarks all together, like the

 6    Otard trademark owner.
```



Page 37

CONFIDENTIAL



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Q.    Does Bacardi & Company make

Page 38

CONFIDENTIAL

1  & Company Limited has these two internal

2  departments.  I promise you, I didn't

3  reread the license before today, so I may

4  have read it years ago.

5      Q.     Understood.

6            (Exhibit 155, marked for

7      identification, U.S. patent and

8      trademark office for the Bacardi

9      Untameable trademark application.)

10     Q.     I'm handing you what's been

11  marked as Exhibit 155.  It's the printout

12  from the U.S. Patent and Trademark Office

13  for the Bacardi Untameable trademark

14  application filed on, looks like July 17,

15  2013, bearing serial number 79135542.

16            Please take a moment and review

17  this document.

18     A.     Yes, I've seen this document.

19     Q.     You've seen this document

20  before, excellent.  If you look on the

21  first page, in details it says, name,

22  Bacardi & Company Limited.  Do you see

23  that?

24     A.     Yes.

25     Q.     Do you know, was Bacardi &

Page 40

CONFIDENTIAL

```
 1    Company Limited the owner of the Bacardi
 2    Untameable trademark?
 3              MR. LYNCH:   Objection.  I don't
 4        think the trademark ever issued, did
 5        it?
 6        Q.    You may answer.
 7              MR. LYNCH:  Objection, this is
 8        an application.  You can answer if
 9        you're able to.
10        A.    So Bacardi & Company Limited is
11    the owner of the Bacardi Untameable
12    trademark registration in Liechtenstein.
13    That is the home country of Bacardi &
14    Company Limited.  In that respect, yes,
15    it is the owner of Bacardi Untameable.
16              In the United States this is an
17    application, but it isn't material to
18    registration because the process was
19    suspended due to the litigation.
20        Q.    To the extent that there are
21    any common law rights in the Bacardi
22    Untameable mark, is it Bacardi &
23    Company's contention that it owns the
24    common law rights to the mark?
25              MR. LYNCH:  I'm going to object
```

Page 41

CONFIDENTIAL

```
 1         that it's beyond the scope of the
 2         deposition topics, and it also calls
 3         for a legal conclusion, but if you're
 4         able to answer that, you may.
 5         A.    The answer is yes.
 6              MR. WILSON:  Why don't we take
 7         a break, use the restroom.
 8              THE VIDEOGRAPHER:  Going off
 9         the record at 10:39 a.m.
10              (Recess.)
11              THE VIDEOGRAPHER:  We are back
12         on the record at 10:51 a.m., this
13         starts the beginning of media two.
14              (Exhibit 156, marked for
15         identification, Bates stamped
16         BACO0000001 through 016.)
17         Q.    What does it say at the top,
18    sir, what is the document title?
19         A.    Created on 2012, 12/14.
20         Q.    2012.  I'm handing you a
21    document that's been marked as Exhibit
22    Number 156.  It is a document bearing
23    Bates numbers BACO1 through 16.  Please
24    take a moment and review the document.
25    Do you recognize this document, sir?
```

Page 42

CONFIDENTIAL

```
 1    question, after this, for instance,
 2    *tame* search was run, in the standard
 3    processes, since we have already some
 4    results and some ideas of potential
 5    risks, we don't run very broad searches,
 6    we just narrow the scope.
 7        Q.    I believe you testified that
 8    Bacardi & Company did not receive
 9    Exhibit 156; is that correct?
10            MR. LYNCH:  Objection, asked
11        and answered.  You can answer, if you
12        know.  I think I made the
13        representation.
14            MR. WILSON:  Yes, I want to
15        make sure I got the right one.
16        A.    Yeah, I believe we didn't
17    receive this.  I never saw it.
18        Q.    I believe that you said you did
19    review Exhibit 157; is that correct?
20        A.    Yes, 157, I believe we received
21    it and I reviewed it, yes.
22        Q.    Is this the search report that
23    Bacardi & Company used to then perform
24    its more narrow dive into the results?
25            MR. LYNCH:  Is what?
```

Page 71

CONFIDENTIAL

1    Q.    Is Exhibit 157 the search
2  report that Bacardi & Company used in
3  order to make a more narrow dive --
4         MR. LYNCH:  Is it among the
5      searches, I'm not sure what you're
6      asking.  That certainly wasn't the
7      only basis.  But if it played some
8      role in it, you can answer the
9      question.
10   A.    Yes, this is certainly, if we
11 want to call it the source of inspiration
12 for the further legal reasoning and the
13 further searches, yes.
14   Q.    Were there any other search
15 reports other than 157 that Bacardi &
16 Company had reviewed before making their
17 deeper dive?
18         MR. LYNCH:  Objection.  You can
19     answer.
20   A.    159.  Exhibit 159 is certainly
21 from the same lot, so we took it into
22 account for planning further steps.  We
23 also had the Lewis Silkin analysis report
24 in mind when we planned the further
25 steps.

Page 72

CONFIDENTIAL

```
1    we saw it today on these papers.
2         Q.    Prior to launching the
3    Untameable, the Bacardi Untameable ad
4    campaign, was Bacardi and -- did Bacardi
5    & Company know of Lodestar's Untamed word
6    mark?
7              MR. LYNCH:  One moment.
8         Objection, I would just -- if you say
9         prior to the launch of the Bacardi
10        Untameable campaign, did Bacardi &
11        Company know of, or was it aware of
12        Lodestar's Untamed word mark, is that
13        the question?
14             MR. WILSON:  So the question --
15        yes, I could probably clean up a
16        little bit.
17        Q.    Prior to launching the Bacardi
18   Untameable ad campaign, was Bacardi &
19   Company aware of Lodestar's Untamed word
20   mark?
21             MR. LYNCH:  Objection, assumes
22        facts not in evidence.  Bacardi & Co.
23        did not launch any campaigns, but you
24        can answer if you understand the
25        question.
```

Page 131

CONFIDENTIAL

```
 1        A.       And as I said before, Bacardi &
 2   Company was aware of what came out of the
 3   trademark registers that are public
 4   domain information; was not aware of any
 5   use of that word mark.
 6        Q.       Did -- prior to the launch of
 7   the Bacardi Untameable advertising
 8   campaign, did Bacardi & Company
 9   investigate the use of the -- of
10   Lodestar's Untamed word mark?
11             MR. LYNCH:  Objection just to
12        the extent that the question calls
13        for privileged communications, legal
14        advice or work product.  Do not
15        disclose that.  I think you can
16        answer this yes or no.
17             THE WITNESS:  And the question
18        was?  Sorry.
19             (Requested portion of the
20        record was read back.)
21        A.       Yes.
22        Q.       Prior to the launch of the
23   Bacardi Untameable advertising campaign,
24   did Bacardi & Company investigate
25   Lodestar's use of the stylized Untamed
```

Page 132

```
 1                    CERTIFICATION

 2

 3       I, JEREMY RICHMAN, a Notary Public for

 4   and within the State of New York, do

 5   hereby certify:

 6       That the witness whose testimony as

 7   herein set forth, was duly sworn by me;

 8   and that the within transcript is a true

 9   record of the testimony given by said

10   witness.

11       I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I am

14   in no way interested in the outcome of

15   this matter.

16       IN WITNESS WHEREOF, I have hereunto

17   set my hand this 20th day of November,

18   2018.

19

20

21

22

23

24

25        JEREMY RICHMAN
```

Page 192

45

1   KELLEY DRYE & WARREN LLP
2       Tahir L. Boykins (State Bar No. 323441)
        tboykins@kelleydrye.com
3   10100 Santa Monica Boulevard
    Los Angeles, CA 90067-4008
    Telephone: (310) 712-6100
4   Facsimile: (310) 712-6199

5   KELLEY DRYE & WARREN LLP
6       Michael C. Lynch (*pro hac vice*)
        mlynch@kelleydrye.com
        Andrea L. Calvaruso (*pro hac vice*)
7       acalvaruso@kelleydrye.com
8   101 Park Avenue
    New York, NY 10178
9   Telephone: (212) 808-7800
    Facsimile: (212) 808-7897

10  Attorneys for Bacardi & Company Limited,
    Bacardi U.S.A., Inc. and Bacardi Limited

11
                    **UNITED STATES DISTRICT COURT**
12
          **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
13

14
15  LODESTAR ANSTALT, a Liechtenstein    Case No. 2:16-cv-06411-CAS-FFMx
    company,
16                                        **MEMORANDUM OF POINTS
                                          AND AUTHORITIES IN
17             Plaintiff,                 SUPPORT OF MOTION FOR
                                          SUMMARY JUDGMENT
18      v.                                PURSUANT TO FED. R. CIV. P. 56**

19  BACARDI & COMPANY LIMITED, a          Date: June 17, 2019
    Liechtenstein company, BACARDI        Time: 10:00 a.m.
20  U.S.A., Inc., a Delaware corporation, and
    BACARDI LIMITED, a Bermuda            Judge: Hon. Cristina A. Snyder
21  company,                              Place: Courtroom 8D

22             Defendants.                **UNREDACTED VERSION OF
                                          DOCUMENT PROPOSED TO BE
23                                        FILED UNDER SEAL**

24
25  AND RELATED COUNTERCLAIMS.

26
27
28
                              **ER 678**

Case 19-55864 #2/20/2019, ID: 11540447, DktEntry: 23, Page 49 of 49

1   evidence. . . that customers are likely to associate the two products or conclude that

2   the products come from the same source," summary judgment is appropriate. *Id.*

3   Moreover, "[m]eaningful differences" between products may negate confusion, even

4   when the products are within the same category. *Matrix*, 290 F. Supp. 2d at 1092;

5   *Nautilus Group*, *Inc.*, 427 F. Supp. 2d at 996 ("proximity of goods" factor favored

6   defendant even though both products were in-home exercise equipment).

7          Rum and whiskey are different products with different tastes and

8   characteristics.[16] *See Sazerac Co. v. Fetzer Vineyards*, *Inc.*, 265 F. Supp. 3d 1013,

9   1035 (N.D. Cal. 2017) (bourbon and wine are "very distinct products" because "[t]hey

10  have different alcohol contents and social uses, and they occupy different sections of

11  stores where they are offered for sale"). Rum is derived from sugarcane juice or

12  molasses, whereas whiskey is derived from grains. (SUF 67). At retail stores, rum is

13  typically grouped together separate from other types of spirits, including whiskey.[17]

14  Plaintiff even admits that the target consumer for its own whiskey and rum products

15  differs. (SUF 62). In any event, given the marks' different appearances, there would

16  be no likelihood of confusion even if the parties' product categories were the same.

17  *See* § III.B.2; *Nautilus Group*, 427 F. Supp. 2d at 996.

18                    **4.    There is No Evidence of Actual Confusion**

19          Lodestar admits that it is unaware of any U.S. consumers who have been

20  confused as to the source of its products. (SUF 55-59). This is unsurprising because

21  Plaintiff had not sold *any* rum to U.S. consumers when Defendants launched the

22  BACARDI Ad Campaign, and, even prior to the campaign, whiskey sales averaged

23  only approximately $59 thousand per year.[18] (SUF 37, 42). Where, as here, the marks

24  _____

25  [16]  As of November 2013, Plaintiff did not use, and had no intent to use, the
    UNTAMED MARKS in connection with rum in U.S. commerce. *See* §§ III.A.1,
26  III.A.2.
    [17]  Defendants and/or their affiliates do not sell whiskey under the BACARDI mark.
27  (SUF 69).
    [18]  Plaintiff has argued that there is evidence of consumers associating the term

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT